United States District Court
Southern District of Texas
**ENTERED**
September 04, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRIAN EDWARD DAVIS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-16-1867 |
| | § | |
| BOBBY LUMPKIN, Director, | § | |
| Texas Department of Criminal | § | |
| Justice - Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

The petitioner, Texas death-row inmate Brian Edward Davis, initiated this federal habeas corpus action in 2016. Davis filed a Death Penalty Case Application for Post-Conviction Writ of Habeas Corpus in 2020 ("Petition"). After extensive litigation, this case is before the court on Director Bobby Lumpkin of the Texas Department of Criminal Justice—Correctional Institutions Division's Second Amended Answer with Brief in Support ("Answer"). After considering the pleadings, the record, and the applicable law, the court will deny Davis's petition and dismiss this action for the reasons explained below.

## I. **Factual and Procedural Background**

On August 13, 1991, a neighbor found Michael Alan Foster dead in his apartment. The State of Texas indicted Davis for capital murder. The indictment accused Foster of intentionally killing

Foster on or about August 10, 1991, during a robbery.[1]  Davis stood trial in the 230th District Court of Harris County, Texas, with the Honorable Judge Joe Kegans presiding.  A jury convicted Davis of capital murder on June 11, 1992, and he was sentenced to death on June 16, 1992.

After extensive post-trial proceedings in both state and federal court, the Texas Court of Criminal Appeals set aside Davis's death sentence in 2009.  In 2011, the State of Texas held a punishment-only retrial with the Honorable Judge Belinda Hill presiding.  Davis was again sentenced to death on March 9, 2011.

A detailed review of the factual background and legal proceedings provides important context to Davis's federal habeas claims.

**A.    The State's Case for Guilt**

On August 10, 1991, Michael Alan Foster went to the Pik 'N Pak bar in Houston to hear a band perform.  Foster, who was intellectually disabled, lived by himself.  That same night, the owner of Pik 'N Pak saw Davis and his wife, Tina Louise McDonald,

---

[1]Clerk's Record [1992], Docket Entry No. 32-1 at 8.  For purposes of identification all page numbers reference the pagination of each docket entry in the court's electronic case filing ("ECF") system. The record contains material from both Davis's initial trial proceedings in 1992 and the retrial of his guilt in 2011.  When necessary to avoid confusion, the court will include the date of his trial or resentencing in brackets when citing the records.

-2-

arguing inside the bar.  Davis was dressed in a way that revealed the large swastika tattoo on his chest.  The owner twice warned the couple that they would be kicked out if they did not quit arguing.

After he closed the bar, the owner saw Davis and McDonald arguing again.  Eventually, the owner saw Foster get into a car and leave with the couple.  The owner was surprised; he knew Foster did not associate with people like Davis and McDonald.

On Tuesday, August 13, 1991, one of Foster's friends who had not seen him in a few days went inside his apartment.  Foster's usually tidy apartment was in disarray.  The friend called the police after finding Foster laying on the ground, covered in blood, with a pillow on his head.  Foster was partially undressed. Someone had written white supremacist symbols on his body and on the apartment walls.

An autopsy revealed that Foster had been dead for at least several hours when he was found.  Foster had suffered numerous stab wounds, including to his neck, abdomen, chest, and back.

The police had little information to proceed with the investigation.  The police knew that a black leather jacket and double-edged knife were missing from Foster's apartment.  The police found promotional flyers on Foster's body advertising concerts at local bars.  Still, nothing at the crime scene indicated who had killed Foster.

The police investigation led to the club Foster had visited.

-3-

The owner of the Pik 'N Pak club provided the police with a description of the people Foster left with on August 10.  With that description, the police sought information from members of the skinhead community, which ultimately led them to McDonald.

By that point, both Davis and McDonald were already in police custody for an unrelated crime.  The bar owner later identified Davis and McDonald as the couple with whom Foster left.  The police recovered items in McDonald's car which had been taken from Foster's apartment such as his jacket and knife.

With evidence connecting McDonald to the murder, the police interviewed her in jail a total of four times.  The police repeatedly told McDonald that all the evidence pointed to her as the killer.  During this time, McDonald occasionally spoke with Davis, who was also still in custody, on the phone.

Police officers first approached Davis in jail to speak about the murder on September 10.  The police ceased all questioning when Davis asked to speak to the attorney appointed on his unrelated charge.

Police officers obtained hair samples from Davis and McDonald, which they used for comparison with crime scene evidence.  The police did not ask them any questions about the murder during that interaction.  The police obtained a handwriting sample from McDonald in late October.  On November 12, the police secured a blood sample from her.

On November 21, 1991, Davis asked to speak with police officers. Davis told a police detective that "he was willing to confess to this crime in exchange for immunity for Tina McDonald."[2] Davis also wanted a transfer to a different part of the jail facility. The police detective told Davis that he could not promise anything, but that he would convey Davis's request to an assistant district attorney.[3] Davis then went before a state judge who informed Davis of his rights. Davis waived his rights in court.

Police officers conducted a videotaped interrogation with an assistant district attorney present. The assistant district attorney told Davis that "the State was not making any deals or agreements with him, that Tina McDonald would be prosecuted if the evidence supported it, and that [Davis] did not have to make a statement."[4] A police detective then again advised Davis of his rights, and he again waived them.

Davis gave an hour-and-twenty-minute-long videotaped statement confessing to the murder.[5] Davis explained that he and McDonald

---

[2]Supplemental Clerk's Record [1992], Findings of Fact and Conclusions of Law Concerning the Voluntariness and Admissibility of the Defendant's Videotaped Oral Confession, Docket Entry No. 32-3 at 4.

[3]Id.

[4]Id. at 5.

[5]See Post Conviction Writ State's Writ Exhibit A, Transcript of (continued...)

met Foster for the first time at a bar on the night of the murder. They gave Foster a ride home in return for gas money. Davis had been drinking heavily.[6] As they drove, Davis grew angry "by the way [Foster] was acting toward" McDonald.[7] Davis said: "I wasn't for sure what I was going to do[,] you know.  I didn't have it really planned to[,] you know[,] to kill the guy . . . [but] I knew I was going to whoop him up once we got to his house . . . ."[8]

Foster invited the couple into his apartment.  Once inside, Foster said he did not have any money.  Davis began hitting him. In his confession, Davis described in detail how he assaulted Foster.  So that he would not leave fingerprints, Davis put socks on his hands and then began stabbing Foster with a knife he found on the dresser.  Davis got out his own knife and repeatedly stabbed Foster until blood began spurting out of his body.

After Foster had died, Davis unsuccessfully searched his body for money.  Davis told McDonald to write on the walls to throw off investigators.  Davis admitted that he stole various items from the apartment, including ones later recovered by the police.

Davis, however, had difficulty remembering some details about

---

(...continued)
Applicant's Confession, Docket Entry No. 34-55 at 166-208.

[6]Id. at 176, 185.

[7]Id. at 188.

[8]Id.

-6-

the murder.  Davis was unclear on at which bar he met Foster and on which night it had happened.[9]  Davis specifically said he "didn't know the date this took place" but "[i]t was either Friday or Saturday."[10]  Davis, however, also provided many verifiably correct details about the crime.[11]

Davis's confession led to his arrest for capital murder for intentionally killing Foster on or about August 10, 1991, during a robbery.

## B.   Davis's 1992 Trial

The State's case against Davis focused on his confession to Foster's murder.  The defense challenged Davis's confession in a two-day pre-trial suppression hearing where nine witnesses testified.  Davis argued that the police had not honored his right to counsel and the State had improperly promised him immunity for McDonald if he confessed.  The trial court denied the motion to suppress.  The trial court subsequently entered factual findings and concluded that Davis gave his in-custody statement

---

[9]Davis gave the police the wrong name for the club where he met Foster.  Id. at 170, 173.  He later clarified that it was the Pik' N Pak.  Id. at 186.

[10]Id. at 170, 174.  Davis, in fact, wanted to pause the interview to confirm with a friend which night he had visited the Pik 'N Pak club. Id. at 193.

[11]Answer, Docket Entry No. 88 at 154-57 (listing details).

voluntarily.[12]

At trial, Davis renewed his objections to the confession.[13] The trial court overruled his objection and admitted Davis's videotaped confession into evidence.[14] Still, the defense attempted to call Davis's confession into question before the jury on several grounds.[15]

The jury convicted Davis of capital murder on June 11, 1992. A separate penalty hearing resulted in a death sentence.

## C. Post-Trial Procedural History and Davis's Second Death Sentence

Davis's case presents a lengthy, and intricate, procedural history. Since Davis's conviction, he has initiated extensive legal proceedings. Davis has brought his case to the Texas Court of Criminal Appeals twice in direct appeal proceedings. Davis has filed nine state habeas actions, some of which resulted in a merits review and others which the state courts dismissed as an abuse of

---

[12]Id. at 4-6.

[13]Statement of Facts-Vol. 18 [1992], Jury Trial, Docket Entry No. 32-20 at 115.

[14]Id. at 120.

[15]The defense challenged: the time line provided by Davis's confession through forensic evidence, the reliability of Davis's confession by highlighting confusion over whether the victim had died on Friday or Saturday night, the voluntariness of his confession because he spoke with police to shield his wife from prosecution, the presence of extraneous hairs on the victim's body, and whether he intended to rob the victim when killing him.

-8-

the writ.  This is Davis's second federal petition.  Even after
that expansive litigation, Davis still raises issues for the first
time in his federal petition.

The court will review Davis's complex and detailed procedural
background before turning to the claims he raises in the instant
federal habeas action.


1.   <u>First Direct Appeal and First State Habeas Action</u>

After his conviction and sentencing, Davis sought appellate
review in the Texas Court of Criminal Appeals.  Davis's appellate
brief raised thirty points of error.[16]  The Court of Criminal
Appeals affirmed Davis's conviction and sentence in a published
opinion on January 7, 1998.[17]

On July 2, 1997, Davis filed the first of many state habeas
corpus applications.  Under Texas procedure, the state district
court "is the 'original factfinder,' and [the Court of Criminal
Appeals] is the 'ultimate factfinder.'"  <u>Ex parte Lane,</u> 670 S.W.3d
662, 670 (Tex. Crim. App. 2023) (quoting <u>Ex parte Thuesen,</u> 546
S.W.3d 145, 157 (Tex. Crim. App. 2017)).  The lower court's role is
to make findings of fact and conclusions of law for the Court of
Criminal Appeals' review.  The Court of Criminal Appeals generally

---

[16]Brief for Appellant [1992], Docket Entry No. 32-27 at 3-7.

[17]<u>Davis v. State,</u> No. AP 71,513, 961 S.W.2d 156 (Tex. Crim. App.
1998).

adopts the lower court's recommendation unless it is not supported by the record.  See Ex parte Garza, 620 S.W.3d 801, 808 (Tex. Crim. App. 2021).  The Court of Criminal Appeals makes the final decision about the disposition of an inmate's habeas petition.

Davis's first habeas application raised three grounds for relief.[18]  The trial court signed the State's proposed findings and conclusions which recommended the denial of habeas relief.[19]  The Court of Criminal Appeals adopted the lower court's findings and denied relief in 1999.[20]

> 2.   First Federal Habeas Action and Second State Habeas Action

Davis filed an initial petition for a federal writ of habeas corpus on March 9, 2000.[21]  Davis's federal petition raised two grounds for relief, both related to McDonald's exertion of her Fifth Amendment rights in the suppression hearing.[22]  On that same

---

[18]Application for Post-Conviction Writ of Habeas Corpus Pursuant to Article 11.071 V.A.C.C.P., Docket Entry No. 34-1 at 17.

[19]Id.

[20]Ex parte Davis, No. WR-40,339-01 (Tex. Crim. App. Mar. 10, 1999) (unpublished), Docket Entry No. 34-3 at 3-4.

[21]Davis v. Johnson, No. H-00-0852 (S.D. Houston).  District Judge John D. Rainey presided over Davis's initial federal habeas application.

[22]Petition for Writ of Habeas Corpus by Person in State Custody Capital Murder/Death Sentence, Davis v. Johnson, No. H-00-0852 (S.D. Houston), Docket Entry No. 2 at 2.

date, Davis also filed a second state writ application, which raised the same issues as his initial federal petition.[23]   On September 13, 2000, the Court of Criminal Appeals held that Davis's subsequent state writ application did not satisfy the requirements of Article 11.071, § 5 of the Texas Code of Criminal Procedure which governs successive habeas applications.   The Court of Criminal Appeals dismissed Davis's second application as an abuse of the writ.[24]

On October 1, 2001, the federal district court entered summary judgment in the respondent's favor, denied habeas corpus relief, and dismissed Davis's initial federal petition with prejudice.[25] Davis did not appeal from the district court's decision denying his federal habeas petition.

3.   Third State Habeas Application

Facing an execution date, Davis filed a third state habeas application on April 15, 2002.[26]  For the first time, Davis relied on the jurisprudence flowing from Penry v. Lynaugh, 109 S. Ct. 2934

---

[23]See Application for Writ of Habeas Corpus, Docket Entry No. 34-4 at 6-42.

[24]Ex parte Davis, No. WR 40,339-02 (Tex. Crim. App. Sept. 13, 2000) (unpublished), Docket Entry No. 34-5 at 3-4.

[25]Order, Davis v. Johnson, No. H-00-0852 (S.D. Houston), Docket Entry No. 20.

[26]See Application for Writ of Habeas Corpus Imminent Execution Scheduled for May 7, 2002, Docket Entry No. 34-6 at 7.

(1989), to argue that the jury instructions precluded jurors from fully considering his mitigating evidence.  Davis also argued that he is actually innocent of capital murder.  The Court of Criminal Appeals dismissed the third application as an abuse of the writ.[27] Davis also unsuccessfully filed motions to stay his execution in the Fifth Circuit and the United States Supreme Court.[28]

4. <u>Fourth and Fifth State Habeas Applications: Initial Atkins Claim</u>

As Davis's execution date drew closer, the United States Supreme Court had under consideration a case addressing whether the Eighth Amendment's cruel and unusual punishment clause prevents a State from executing an inmate with intellectual disabilities.  On May 7, 2002 (the day of his scheduled execution), Davis filed a fourth state habeas application, which argued that he is intellectually disabled and thus ineligible for execution.[29]  Davis also asked for a stay of his execution date.  The Court of Criminal Appeals denied Davis's fourth habeas application as an abuse of the

---

[27]<u>Ex parte Davis,</u> No. WR 40,339-03, at *2 (Tex. Crim. App. Apr. 29, 2002) (unpublished), Docket Entry No. 34-9 at 3-4.

[28]<u>In re Davis,</u> No. 02-20479 (5th Cir. May 6, 2002); <u>In re Davis,</u> 122 S. Ct. 1814 (2002).

[29]<u>See</u> Application for Postconviction Writ of Habeas Corpus and Motion for Stay of Execution, Docket Entry No. 34-10 at 2-31.

writ.[30]   On that same date, the Supreme Court entered an order staying Davis's execution.[31]   The Supreme Court subsequently denied certiorari review after the date for his execution had passed.[32]

On June 20, 2002, the Supreme Court held in <u>Atkins v. Virginia,</u> 122 S. Ct. 2242 (2002), that the Eighth Amendment bars the execution of intellectually disabled offenders.   On July 8, 2002, the state trial court set a new execution date.[33]   Davis filed a fifth subsequent application on August 7, 2002, based on the new <u>Atkins</u> decision.[34]   The Court of Criminal Appeals stayed Davis's execution and remanded Davis's application to the trial court for consideration.[35]

The trial court held a six-day evidentiary hearing in 2004.[36] The parties presented testimony from mental-health professionals and lay witnesses.   The trial court entered findings of fact and

--------------------------------------------------

[30]<u>Ex parte Davis,</u> No. WR 40,339-04 (Tex. Crim. App. May 7, 2002) (unpublished), Docket Entry No. 34-11 at 3-4.

[31]<u>Davis v. Texas,</u> No. 01-10022, 122 S. Ct. 1815 (May 7, 2002), Docket Entry No. 34-14 at 2.

[32]<u>See</u> Order, Docket Entry No. 34-16.

[33]<u>See</u> Execution Order, Docket Entry No. 34-18 at 2-3.

[34]<u>See</u> Application for Postconviction Writ of Habeas Corpus and Motion for Stay of Execution, Docket Entry No. 34-24 at 2-178.

[35]<u>Ex parte Davis,</u> No. WR-40,339-05, 2002 WL 33000856 (Tex. Crim. App. Aug. 9, 2002) (unpublished), Docket Entry No. 34-37 at 1-2.

[36]<u>See</u> Writ Hearing, Docket Entry Nos. 34-26 to -36.

-13-

conclusions of law in 2005 recommending the denial of relief because Davis failed to prove his <u>Atkins</u> claim.[37]   In 2006, the Court of Criminal Appeals adopted the lower court's recommendation and denied relief.[38]

    5.   <u>Sixth State Habeas Application</u>

    Davis filed a sixth state habeas application while his fifth application was still pending.[39]   Davis's sixth state habeas application raised a <u>Penry</u> claim for the second time.   The Court of Criminal Appeals initially remanded the sixth application for consideration but then dismissed it because of changes in Texas law.[40]   The Court of Criminal Appeals, however, decided to reconsider the <u>Penry</u> issue Davis had raised in his third habeas application.[41]   The Court of Criminal Appeals granted relief on the <u>Penry</u> claim and ordered a new trial only on punishment.[42]

---

[37]<u>See</u> Postconviction Writ, Trial Court's Findings of Fact, Conclusions of Law and Order, Docket Entry No. 34-23 at 140-81.

[38]<u>Ex parte Davis,</u> No. WR-40,339-05, Docket Entry No. 34-38 at 1-2.

[39]<u>See</u> Subsequent 11.071 Application for Writ of Habeas Corpus, Application for Postconviction Writ of Habeas Corpus, Docket Entry No. 34-44 at 8-31.

[40]<u>Ex parte Davis,</u> No. WR 40,339-06 at *1-2 (Nov. 18, 2009) (unpublished), Docket Entry No. 34-47 at 3-5.

[41]<u>Id.</u> at 5.

[42]<u>Ex parte Davis,</u> No. AP-76,263, 2009 WL 3839065 (Tex. Crim. App.
(continued...)

6.   <u>Retrial of Davis's Punishment</u>

The trial court appointed R. P. "Skip" Cornelius and Allen Tanner to represent Davis in the retrial of Davis's sentencing. The State of Texas held a twelve-day punishment hearing in 2011. The jury determined Davis's sentence by answering three special-issue questions:

<u>SPECIAL ISSUE NO. 1</u>
Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant, Brian Edward Davis, that caused the death of Michael Alan Foster was committed deliberately and with the reasonable expectation that the death of Michael Alan Foster or another would result?

<u>SPECIAL ISSUE NO. 2</u>
Do you find from the evidence beyond a reasonable doubt there is a probability that the defendant Brian Edward Davis would commit criminal acts of violence that would constitute a continuing threat to society?

<u>SPECIAL ISSUE NO. 3</u>
Do you find from the evidence taking into consideration all of the evidence including, the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?[43]

_____

(...continued)
Nov. 18, 2009) (unpublished).

[43]Clerk's Record [2011], Docket Entry No. 33-3 at 166-68.

-15-

So that the jury could consider all relevant evidence in making its sentencing decision, the State adduced testimony about the Foster murder, including Davis's confession to the crime. Additionally, the State presented Davis's long history of criminal offenses.   Davis had committed numerous crimes as a juvenile, including burglary and theft.   During his time in the Texas Youth Commission, a psychologist labeled Davis with learning disabilities and emotional disturbances, but also identified him as a leader. Davis was repeatedly suspended and ultimately expelled from junior high school.

As an adult, Davis was convicted for delivery of marijuana. He had his resulting probation revoked. After serving a prison term, he absconded from a parole correctional program, which resulted in another prison sentence.   Davis became a member of the Aryan Brotherhood of Texas and demonstrated his membership through various Nazi tattoos.   Davis committed numerous prison violations such as possessing weapons, threatening officers, having drugs, assaulting officers by throwing bodily waste at them, using racial slurs, and possessing a cell phone.

After he was released from prison, Davis committed numerous unadjudicated bad acts, such as throwing a man off a second story building.  Davis assaulted former girlfriends.  Davis assaulted and shot at other people without provocation.   Davis once choked his

-16-

own mother. Davis committed violent robberies. Davis beat his wife, Tina McDonald.

Two of Davis's violent acts were particularly striking. First, McDonald and Davis committed a violent assault on a man named Steven Sherman only days after the Foster murder. In the assault, McDonald used a knife similar to one taken from Foster's apartment. The couple tied up Sherman and then stabbed him in the throat, stomach, and back. Second, the State presented evidence that Davis had committed another murder. In 1988, Davis killed Keith Blaylock during a robbery in Mineral Wells, Texas.

The State also called an expert, forensic psychologist Dr. Timothy Proctor, who testified that Davis had average intelligence. Dr. Proctor observed no signs of mental illness, but opined that Davis had an antisocial personality and refused to follow rules. Dr. Proctor disagreed with any opinion that Davis's background made his life choices inevitable.

The defense at the retrial attempted both to call into question Davis's commission of the Foster murder and to provide evidence mitigating against a death sentence. The defense tried to pin the Foster murder on McDonald. The defense emphasized the lack of physical evidence pointing to Davis's involvement in the crime, but the significant evidence pointing toward McDonald's. The defense bolstered this focus by questioning the veracity of Davis's confession. The defense also called numerous witnesses to refute Davis's involvement in the extraneous Blaylock murder.

-17-

The defense called nine witnesses to give testimony about Davis's background and life history. Witnesses included family members and friends who provided mitigating insight into his upbringing. The defense presented other witnesses who testified that Davis had not been problematic in prison after his capital conviction. The defense also called a prison expert who described how prison practices and procedures help control the behavior of life-sentenced inmates.

The defense also called expert witnesses to testify about Davis's mental health. Dr. Gilda Kessner, a forensic psychologist, testified that testing showed that Davis was on the "cusp of low average to borderline intellectual functioning."[44]  Dr. Kessner, however, explicitly testified that Davis was not intellectually disabled.[45]

The defense called Dr. Jerome Brown, a clinical psychologist, who testified that Davis was born with "wiring that wasn't right."[46] The inability of Davis's family to help him cope and his lack of positive role models set the stage for his behavioral problems. The lack of a consistent residence impaired schools' ability to provide

---

[44]Reporter's Record-Vol. 27 [2011], Punishment Proceedings, Docket Entry No. 33-34 at 47.

[45]Id. at 86.

[46]Reporter's Record-Vol. 27 [2011], Punishment Proceedings, Docket Entry No. 33-34 at 150.

support. Dr. Brown testified that Davis had self-esteem issues, learning problems, hyperactivity, and substance abuse problems. Dr. Brown had received information that Davis had been sexually assaulted as a youth.

The jury answered Texas's special-issue questions in a manner requiring the imposition of a death sentence.[47] The trial court sentenced Davis to death on March 9, 2011.[48]

### 7. Second Direct Appeal

Davis challenged his second death sentence in an appellate brief raising six points of error.[49] On October 23, 2013, the Court of Criminal Appeals affirmed Davis's second death sentence.[50] Davis did not seek certiorari review.

### 8. Seventh and Eight State Habeas Applications

During the pendency of his second direct appeal, Davis filed a seventh state writ application raising fourteen claims, including an Atkins intellectual disability claim.[51] The trial court signed

---

[47]Clerk's Record [2011], Docket Entry No. 33-3 at 166-68.

[48]Reporter's Record [2011], Docket Entry No. 33-37 at 8-9.

[49]See Brief for Appellant, Docket Entry No. 33-46 at 3-6.

[50]Davis v. State, No. AP-76,521, 2013 WL 5773353 (Tex. Crim. App. Oct. 23, 2013) (unpublished), Docket Entry No. 33-48.

[51]See Postconviction Writ, Initial Application for Writ of Habeas Corpus (Filed Pursuant to Tex. Code Crim. Pro. art. 11.071), Docket Entry No. 34-53 at 9-16. During the pendency of his direct appeal,
(continued...)

-19-

the State's proposed findings of facts and conclusions of law and recommended that the Court of Criminal Appeals deny relief.[52]

Before the Court of Criminal Appeals could rule on the trial court's recommendation, however, Davis filed an eighth state habeas application raising claims relating to both his 1992 trial and his 2011 punishment hearing.[53] On May 25, 2016, the Court of Criminal Appeals entered an order disposing of the seventh and eighth habeas applications. The Court of Criminal Appeals relied on the trial court's findings and its own review to deny the seventh application. The Court of Criminal Appeals dismissed his eighth application as an abuse of the writ.[54] The Supreme Court denied Davis's petition for a writ of certiorari from his eighth writ

---

(...continued)

Davis also requested that the Court of Criminal Appeals reconsider on its own initiative the denial of the Atkins claim from his fifth state application. The Court of Criminal Appeals denied Davis's request because "[r]e-opening a writ application attacking the prior sentence is not the appropriate vehicle" for addressing any Atkins claim. Ex parte Davis, No. WR 40,339-05, 2012 WL 3600293 (Tex. Crim. App. Aug. 22, 2012) (unpublished), Docket Entry No. 34-39 at 4. The Court of Criminal Appeals advised Davis to raise any Atkins claim in a separate writ.

[52]See Postconviction Writ, Findings of Fact and Conclusions of Law, and Order, Docket Entry No. 34-57 at 207–63.

[53]See Postconviction Writ, Subsequent Application for Writ of Habeas Corpus Filed Pursuant to Article 11.071, Section 5(A)(1); Exhibits, Docket Entry No. 34-72 at 5–6.

[54]Ex parte Davis, Nos. WR-40,339-07 & WR-40,339-08, 2016 WL 3094320 (May 25, 2016) (unpublished).

application.[55]

9.    Initiation of Davis's Second Federal Proceedings

On June 29, 2016, this court appointed counsel to represent Davis throughout the course of federal review. (Docket Entry No. 2).  Instead of submitting a federal habeas petition, Davis returned again to state court and filed a ninth state habeas application.  This court stayed the federal action.[56]

10.    Ninth State Habeas Application

Davis's ninth state application raised five claims, including another Atkins claim.[57]  The Court of Criminal Appeals dismissed four of Davis's claims but remanded his Atkins claim for further proceedings.[58]  On June 24, 2019, the trial court signed the State's proposed findings of fact and conclusions of law.[59]  The trial court recommended that the Court of Criminal Appeals dismiss Davis's

---

[55]Davis v. Texas, 137 S. Ct. 622 (Jan. 9, 2017).

[56]See Order, Docket Entry No. 28.

[57]See Subsequent Application for Writ of Habeas Corpus Filed Pursuant to Article 11.071, Section 5; Exhibits, Docket Entry No. 34-80 at 6-9.

[58]Ex parte Davis, No. WR 40,339-09, 2017 WL 6031852, at *2 (Tex. Crim. App. Dec. 6, 2017), Docket Entry Nos. 34-81 and -82.

[59]See Supplemental Postconviction, Findings of Fact and Conclusions of Law, Docket Entry No. 55-1 at 3-19.

-21-

<u>Atkins</u> claim as an abuse of the writ under Article 11.071, § 5.[60] The Court of Criminal Appeals, however, did not adopt that recommendation. Instead, the Court of Criminal Appeals engaged in its own review and found that Davis did not make an adequate prima facie showing on his <u>Atkins</u> claim. The Court of Criminal Appeals then dismissed Davis's ninth application as an abuse of the writ.[61]

## D. Davis's Federal Petition

On April 9, 2020, Davis filed a federal habeas petition raising twenty-seven claims.[62] The court granted Davis leave to amend his federal petition, but he never submitted an amended petition.[63] As laid out by the parties' briefing, Davis's federal petition raises the following grounds for relief:

1. Davis is actually innocent of capital murder.

2. Insufficient evidence supports Davis's conviction.

3. The trial court erred in allowing the admission of Davis's confession in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

4. The trial court erred in allowing the admission of Davis's confession in violation of the Fifth and

---

[60]<u>Id.</u> at 16.

[61]<u>Ex parte Davis,</u> No. WR 40,339-09, 2020 WL 1557291, at *3 (Tex. Crim. App. Apr. 1, 2020) (unpublished).

[62]Petition, Docket Entry No. 30.

[63]Docket Entry Nos. 41, 43.

Fourteenth Amendments to the United States Constitution.

5. The trial court committed error when admitting photographic identification procedures that were so unduly suggestive to be violative of Davis's rights to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution.

6. The trial court committed error when admitting photographic identification procedures that were so unduly suggestive to be violative of Davis's rights to due process of law under the Sixth and Fourteenth Amendments to the United States Constitution.

7. The trial court erred in overruling Davis's objection to prosecutorial argument "which struck Davis over the shoulders of counsel" and violated his Fourteenth Amendment due process rights to a fair trial.

8. New DNA technology proves Davis's innocence.

9. The State presented false testimony about DNA during retrial.

10. The State violated <u>Brady v. Maryland,</u> 83 S. Ct. 1194 (1963), by not disclosing that Tina McDonald had been suspected of other home invasions involving white supremacists.

11. Davis is ineligible for the death penalty because he is an individual with intellectual disability.

12. Davis was denied his Sixth Amendment right to effective assistance of counsel because his attorneys failed to:

    • interview and present eyewitnesses to the crime during his trial in 1992 (claim 12(b), (c));

    • present a false confession expert during retrial of punishment in 2011 (claim 12(d));

-23-

- present DNA evidence during retrial that Tina McDonald could not be excluded as the source of a hair found on Foster's shirt (claim 12(e));

- present evidence during retrial regarding Tina McDonald's violent and aggressive character (claim 12(f));

- question Margie Kessler during retrial about calls she received from Davis just before, and after, he confessed (claim 12(g));

- effectively present evidence to rebut the State's case for future dangerousness (claim 12(h));

- present foundational mitigation evidence during retrial from lay witnesses (claim 12(i));

- call a social historian to testify regarding Davis's life history (claim 12(j));

- object during retrial to the admission of the mask as a whole (claim 12(k));

- present expert testimony during retrial regarding the DNA on the stocking (claim 12(l)); and

- effectively investigate and present Davis's Eighth Amendment intellectual disability claim (claim 12(m)).[64]

---

[64]Davis's listing of his ineffective-assistance arguments begins with the standard of review and then proceeds with some inconsistency in labeling the sub-arguments with letters or numbers. To maintain consistency with his enumeration of arguments and the parties' briefing, the court will refer to his first sub-argument as "12(b)" and re-designate any sub-arguments labeled as numbers.

-24-

13.   Davis's 1992 conviction violated his right to due process when the State used false evidence to obtain it.

14.   Davis's 2011 death sentence violated his right to due process when the State used false evidence to obtain it.

15.   The State violated <u>Brady</u> by not disclosing a letter prior to Davis's 2011 punishment-only retrial.

16.   Davis is ineligible for a death sentence because of his low intellectual functioning and appellate counsel was ineffective for failing to raise the issue on appeal.

17.   Davis's death sentence should be vacated because a penalty phase-only retrial in a capital case constitutes deprivation of life without due process of law.

18.   Trial counsel failed to preserve the record for appeal.

19.   Davis's death sentence should be vacated because the punishment phase jury instruction restricted the evidence the jury could determine was mitigating.

20.   Davis's rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence.

21.   Texas's system of administering the death penalty is unconstitutional.

22.   Davis was denied a fair punishment trial because of restrictions on witness testimony.

23.   The trial court abused its discretion in not granting a motion for mistrial after a State's witness testified that Davis had been on death row.

* * *[65]

25. The trial court abused its discretion in prohibiting Davis from asking potential jurors certain questions.

26. The trial abused its discretion in prohibiting Davis from asking potential jurors about his earlier death sentence.

27. The trial court abused its discretion in prohibiting Davis from asking potential jurors about his earlier death sentence.

28. The trial court abused its discretion in needlessly foreclosing Davis from presenting important mitigating evidence about his earlier death sentence.

Davis included issues in his federal petition that he had not exhausted during his extensive state litigation (even though he had filed his ninth habeas application after invoking federal jurisdiction). Specifically, Davis conceded that he had not exhausted claims 1 and 2 in state court.[66] Davis asked the court to stay this case so that he could "move forward in pending DNA testing proceedings under Chapter 64 of the Texas Code of Criminal Procedure."[67] Davis stated that his Chapter 64 litigation involved "DNA retesting of key crime scene evidence in [his] case based on

---

[65]Without explanation, Davis's petition omits a twenty-fourth ground for relief. See Petition, Docket Entry No. 30 at 12. To maintain consistency with the parties' briefing, the court will likewise skip a twenty-fourth claim.

[66]Petitioner Davis's Opposed Motion for Stay and Abeyance to Permit Exhaustion of State Remedies, Docket Entry No. 44 at 1-2.

[67]Id. at 1.

previously unavailable new DNA testing technology . . . ."[68]

This court denied Davis's motion for two reasons.  First, Davis did not litigate his stay request with diligence.  The court had already stayed the proceedings once, Davis could have litigated his DNA evidence during earlier state proceedings, and Davis filed his request late in the habeas process.[69]  Second, "neither federal nor state law precludes an inmate from pursuing Chapter 64 relief concurrent with federal habeas proceedings."[70]  This court's review of the state docket sheet indicates that Davis has taken no action on the Chapter 64 case since that time.[71]

Respondent answered Davis's petition.[72]  After receiving additional briefing, the court rejected Respondent's argument that federal law precluded consideration of any claims involving Davis's guilt/innocence trial in 1992.[73]  Respondent subsequently filed a new answer.[74]  Davis has filed a reply.[75]  (Docket Entry No. 73).

---

[68]Id.

[69]Docket Entry No. 50 at 3.

[70]Id.

[71]See Office of the Harris County District Clerk, available at: https://www.hcdistrictclerk.com (last visited August 21, 2024). "[A] district court may properly take judicial notice of public state court records." Stiel v. Heritage Numismatic Auctions, Inc., 816 F. App'x 888, 892 (5th Cir. 2020).

[72]Docket Entry Nos. 61, 62, 70.

[73]Docket Entry No. 82.

[74]Respondent Lumpkin's Second Amended Answer with Brief in Support
(continued...)

-27-

Respondent has also provided a sur-reply.[76]  This matter is ripe for adjudication.

## II. <u>**Successiveness and the AEDPA Limitations Period**</u>

Respondent argues that two provisions in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") prevent federal consideration of various claims.  First, AEDPA strictly limits an inmate's ability to litigate a successive federal habeas petition.  <u>See</u> 28 U.S.C. § 2244(b). This is Davis's second federal habeas petition.  Davis had a full opportunity to litigate any claims relating to his 1992 trial in his first federal action.  Respondent previously argued that AEDPA's successive-petition provisions would preclude this court from considering any claims in Davis's second habeas petition raising guilt/innocence arguments (specifically claims 2, 3, 4, 5, 6, 7, 10, and 12(b/c)).  Relying on Fifth Circuit authority, <u>In re Greenwood,</u> 2022 WL 501393 (5th Cir. Feb. 18, 2022), the court denied Respondent's argument.[77]  Respondent asks the court to reconsider its

_____

(...continued)
("Answer"), Docket Entry No. 88.

[75]Davis's Reply to Director's Amended Answer ("Reply"), Docket Entry No. 95.

[76]Respondent Lumpkin's Sur-Reply with Brief in Support, Docket Entry No. 98).

[77]Order, Docket Entry No. 84.

successiveness ruling,[78] but does not present any new law or intervening authority that would compel a different result.  The court will not reconsider its earlier decision.

Second, and relatedly, Respondent argues that Davis failed to litigate any claims involving the trial of his guilt in a timely manner.[79] See 28 U.S.C. § 2244(d)(1) ("A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."). Respondent, however, acknowledges that this court's earlier ruling on the viability of his guilt/innocence claims means that "Davis's claims are timely" and only "reiterates the previous arguments to preserve them for appeal."[80]  With the earlier decision regarding successiveness, the court finds that Davis filed his claims in a timely manner.

### III.   **Availability of Federal Review**

Before turning to the grounds for relief, the court pauses to discuss how the way Davis has litigated his claims defines the course of federal review.  Davis's 384-page federal petition raises twenty-seven claims, some of which contain numerous sub-arguments. Federal habeas review, however, is limited in scope.  "When a

---

[78]Answer, Docket Entry No. 88 at 114-20.

[79]Id. at 120-26.

[80]Id. at 120-21.

petitioner fails to properly raise his federal claims in state court, he deprives the State of an opportunity to address those claims in the first instance and frustrates the State's ability to honor his constitutional rights." <u>Cone v. Bell,</u> 129 S. Ct. 1769, 1783 (2009) (quotation omitted).  Respondent argues that Davis defaulted consideration of claims 8, 9, 10, 12(m), 13, 14, 15, 17, and 21 in state court.

**A.   Procedural Default**

The challenged claims fall into four categories.  First, when Davis exhausted claims 17 and 21 in his seventh habeas application, the Court of Criminal Appeals found that Davis had defaulted consideration of them under Texas' contemporaneous-objection rule.[81] Second, Davis exhausted three claims (claims 13, 14, 15) in his eighth habeas application, which the Court of Criminal Appeals dismissed as an abuse of the writ.  This is "an independent and adequate state ground for the purpose of imposing a procedural bar in a subsequent federal habeas proceeding." <u>Gutierrez v. Stephens,</u>

---

[81]Findings of Fact and Conclusions of Law and Order, Docket Entry No. 34-57 at 244, 256, 247, 259-60.  Texas's contemporaneous-objection rule requires "a party to preserve an issue for appellate review" by making "a timely objection with specific grounds for the desired ruling." <u>Livingston v. Johnson,</u> 107 F.3d 297, 311 (5th Cir. 1997). The rule is an adequate and independent state law bar to federal review. <u>See Hughes v. Johnson,</u> 191 F.3d 607, 614 (5th Cir. 1999) (citing <u>Amos v. Scott,</u> 61 F.3d 333, 345 (5th Cir. 1995)).

590 F. App'x 371, 384 (5th Cir. 2014) (quotation omitted).[82]  Third, Davis did not raise claim 12(m) in state court.  Because he would not be able to litigate it in a successive state habeas application, "there is a procedural default."  Coleman v. Thompson, 111 S. Ct. 2546, 2557 n.1 (1991).  Davis defaulted consideration of claims 12(m), 13, 14, 15, 17, and 21.

Respondent's fourth category presents a more difficult question.  Davis raised federal claims 8, 9, 10, and 12(b)/(c) in his ninth state habeas application.  Respondent argues that Davis defaulted consideration those claims by raising them in his abusive ninth state habeas application.[83]  Davis only responds to Respondent's procedural-default argument with regard to claims 9 and 10.  Because of the detailed concerns raised by the procedural status of those claims, the court will consider them later.  Davis, however, does not dispute that he defaulted claim 8 and 12(b)/(c) in state court.

---

[82]Order Dated May 25, 2016, Ex parte Davis, WR-40,339-07 & WR-40,339-08, Docket Entry No. 34-76 at 1-4.  Texas strictly enforces its abuse-of-the-writ doctrine (codified at Tex. Code Crim. Pro. art. 11.071 § 5(a)) and generally prohibits the filing of successive habeas applications.  Tex. Code Crim. Proc. Art. 11.071 § 5(a).

[83]Answer, Docket Entry No. 88 at 210, 215, and 222.  Respondent does not argue that Davis defaulted consideration of claim 11 which he raised in his ninth habeas application.

In conclusion, the court finds that Davis defaulted consideration of claims 8, 12(b)/(c), 12(m), 13, 14, 15, 17, and 21 in state court.

## B.  Procedural Bar

A federal procedural bar results when an inmate fails to follow well-established state procedural rules.  See Lambrix v. Singletary, 117 S. Ct. 1517, 1522 (1997); Coleman, 111 S. Ct. at 2553-54.  A federal court may review an inmate's unexhausted or procedurally barred claims only if the inmate shows: (1) cause and actual prejudice; or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent . . . .'" Haley v. Dretke, 124 S. Ct. 1847, 1852 (2004) (quoting Murray v. Carrier, 106 S. Ct. 2639, 2649 (1986)); see also Schlup v. Delo, 115 S. Ct. 298 (1995).

A petitioner has the burden to overcome a procedural bar.  See McCleskey v. Zant, 111 S. Ct. 1454, 1470 (1991).  Despite his extensive briefing, Davis does not specifically address the procedural default of claims 8, 12(b)/(c), 13, 14, 15, 17, and 21.[84] Davis makes no effort to show cause and prejudice to overcome the procedural bar of those claims.

------

[84]Davis addressed the procedural bar of claim 12(m) in his petition. Davis filed a 108-page reply to Respondent's Answer.  See Reply, Docket Entry No. 95.

Because actual innocence may result in a fundamental miscarriage of justice, inmates who make a sufficient showing of innocence may overcome a procedural bar. Davis raises an actual-innocence claim as a substantive ground for relief, but his briefing is not clear as to whether he intends innocence to serve as a procedural mechanism to allow review of any barred claims.[85] Either way, Davis has not shown innocence under the required standard. Davis makes a wide-ranging argument for innocence, drawing together evidence from trial, construing it in a light most favorable to an acquittal, and then adding to it some evidence which he has developed after trial. Respondent challenges each piece of evidence on which Davis bases his actual-innocence argument. Taken together, Respondent argues that (1) Davis does not rely on "new reliable" evidence as understood by federal law and (2) he does not show that, in the light of newly-discovered evidence, "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable

---

[85]Davis's petition argues that he is "actually innocent of the Foster murder under Herrera [v. Collins], House v. Bell and Schlup v. Delo," but does not identify which claims should pass through the Schlup gateway. In fact, even when citing Schlup Davis's pleadings still treat his actual-innocence arguments as a substantive ground for habeas relief. See Petition, Docket Entry No. 30 at 54 (arguing that he "has made a sufficient Schlup/House v. Bell gateway showing, as well as a sufficient Herrera v. Collins showing, *and habeas relief should be granted on this basis, and a new trial ordered as to guilt-innocence and punishment*")(emphasis added).

doubt." <u>Schlup</u>, 115 S. Ct. 851; <u>see also McQuiggin v. Perkins</u>, 133 S. Ct. 1924, 1935 (2013).

Davis's reply does not substantively respond to Respondent's analysis of his actual-innocence arguments, but instead mostly rests on the allegations in his petition. Davis does not produce new, reliable evidence but instead weaves together loose threads of evidence available at trial into a potential defense blaming the murder on Tina McDonald and other skinheads. <u>See Hancock v. Davis</u>, 906 F.3d 387, 389-90 (5th Cir. 2018) (finding that evidence is not "new" if it was known by the inmate).[86] Merely reframing available evidence does not prove actual innocence because the inmate is "asking courts to usurp the jury's function by considering the same evidence the jury did . . . ." <u>United States v. Vargas-Soto</u>, 35 F.4th 979, 999 (5th Cir. 2022).[87] Davis has not brought forth new, reliable evidence of his innocence. Allegations of innocence do not allow Davis to overcome any procedural bar.

---

[86]Davis relies on various factors such as the medical examiner's trial testimony and accounts from neighbors that they heard noise from Foster's apartment after the time the murder apparently occurred.

[87]Only Davis's blood and hair evidence was not available at trial. That evidence, however, is not necessarily exculpatory. Respondent accurately argues that, even though testing on hair and blood samples found at the scene excludes Davis, nothing in the record attributes that genetic material to the killer. At best, Davis's new hair and blood evidence could show that someone else also may have been in Foster's apartment, but it does not prove that Davis was not there and did not kill him.

-34-

## C.   Conclusion

Davis defaulted consideration of claims 8, 12(b)/(c), 12(m), 13, 14, 15, 17, and 21 in state court. Because Davis has not overcome the resultant procedural bar, federal review is not available for those claims.

## IV. Standard of Review

The Court of Criminal Appeals denied many of Davis's claims when he raised them in state court. A denial by the Court of Criminal Appeals qualifies as an "adjudication on the merits" which is subject to deference under AEDPA's standard of review. See 28 U.S.C. § 2254(d). See Anaya v. Lumpkin, 976 F.3d 545, 550 (5th Cir. 2020). The highly deferential legal standard found in § 2254(d) "imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases." Shoop v. Hill, 139 S. Ct. 504, 506 (2019). A federal habeas corpus court may not grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). Likewise, if a claim presents a question of fact, a petitioner cannot obtain federal habeas relief unless he shows that the state court's decision "was

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[88]

Before turning to Davis's claims, the court observes that his briefing largely fails to address his burden under AEDPA. Davis has the "burden of proof" under AEDPA (and in habeas cases generally). Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). Davis's petition does not provide any indication of where he raised many of his federal claims, how the state courts resolved them, and how that decision was contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1). Davis's petition only addresses the AEDPA standard when briefing claims three, four, and nine. Davis's petition makes no effort to address AEDPA with regard to most claims. See Poree v. Collins, 866 F.3d 235, 250

---

[88]"A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." Matamoros v. Stephens, 783 F.3d 212, 215 (5th Cir. 2015) (citations and internal quotation marks omitted). To constitute an "unreasonable application of" clearly established federal law, a state court's holding "must be objectively unreasonable, not merely wrong; even clear error will not suffice." Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (quoting White v. Woodall, 134 S. Ct. 1697, 1702 (2014)). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Id. (quoting Richter, 131 S. Ct. at 786-87).

(5th Cir. 2017) (stating that an inmate must make a "clear, independent argument that the state court's denial" requires relief under AEDPA).

Even after Respondent's Answer pointed out that Davis had generally not briefed the AEDPA standard, Davis made little effort in his Reply to meet his burden. Davis's Reply only addressed claims 3, 4, 8, and 9. Davis's Reply made no effort to carry his AEDPA burden with regard to his other claims. In short, Davis has almost wholly neglected to show entitlement to relief under AEDPA. The Fifth Circuit in similar circumstances has found that an inmate has abandoned his claims by failing to brief them adequately. See Ramirez v. Stephens, 641 F. App'x 312, 324 (5th Cir. 2016); Poree, 866 F.3d at 250. Davis's inadequate briefing is a sufficient reason for summarily denying all except claims 3, 4, 8 and 9.

Despite Davis's failure to make any effort at meeting his burden, and likewise show that his procedurally defaulted claims warrant federal review, the court will address his claims the interests of justice. In the interests of judicial economy, however, the court will only do so briefly and with great deference to the state court adjudications.

## V.  Discussion

### A.  Actual Innocence (claim 1)

In his first ground for relief, Davis claims that he is actually innocent of capital murder.  Through a meandering, multi-layered argument, Davis crafts a potential defensive strategy based on evidence developed at both trials and afterwards.  Davis claims that the court should "reverse the conviction for the offense of capital murder" because he is actually innocent of the murder.[89]

While Davis presented a limited actual-innocence argument in his third state habeas application, he did not exhaust the full breadth of his federal actual-innocence claim in state court.  Earlier in this litigation, Davis conceded that he had not exhausted his actual-innocence claim.[90]  Davis's failure to exhaust prevents the court from granting relief on claim 1.  See 28 U.S.C. § 2254(b).

Even so, the Supreme Court has not recognized actual innocence as a free-standing federal constitutional claim.  See Herrera v. Collins, 113 S. Ct. 853, 860 (1993).  Because the Supreme Court has never found that actual innocence is "an independently cognizable federal-habeas claim," the arguments in Davis's first claim do not

---

[89]Petition, Docket Entry No. 30 at 57.

[90]Petitioner Davis's Opposed Motion for Stay and Abeyance to Permit Exhaustion of State Remedies, Docket Entry No. 44 at 1-2.

provide an independent basis for federal habeas relief.  Foster v. Quarterman, 466 F.3d 359, 367 (5th Cir. 2006); see also In re Raby, 925 F.3d 749, 755 (5th Cir. 2019); Kinsel v. Cain, 647 F.3d 265, 270 n.20 (5th Cir. 2011).  The court will deny Davis's first claim.


**B.   Sufficiency of the Evidence (claim 2)**

In his second claim, Davis argues that insufficient evidence supported his capital conviction because the State did not prove a "nexus" between the murder and the theft of items from Foster's apartment.  Under Jackson v. Virginia, 99 S. Ct. 2781 (1979), a reviewing court affirms a jury's conviction if, considering all the evidence in a light most favorable to the prosecution, a rational trier of fact could have returned a verdict unfavorable to the defendant.  This demanding inquiry is highly deferential to, and resolves any conflicting evidence in favor of, the jury's verdict.  See United States v. Harris, 293 F.3d 863, 869 (5th Cir. 2002); United States v. Duncan, 919 F.2d 981, 990 (5th Cir. 1990).  AEDPA augments the deferential Jackson analysis, creating a "double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011); see also Coleman v. Jackson, 132 S. Ct. 2060, 2062 (2012).

The Court of Criminal Appeals rejected Davis's claim on direct appeal as follows:

This Court has defined "in the course of committing" an offense listed in Texas Penal Code § 19.03(a)(2) as conduct occurring in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense.  In order for the murder to qualify as a capital murder under § 19.03(a)(2), the intent to rob must be formed prior to or concurrent with the murder. A killing and an unrelated taking of property do not constitute a capital murder.

The evidence establishes that [Davis] believed the victim had money when he was killed. As [Davis] stated in his confession, the victim stated that he had money and that he did not have money. When [Davis] killed the victim[,] he searched the victim's pockets for money. [Davis] also removed the victim's shoe to search for money. A rational jury could determine that when [Davis] killed the victim he formed the intent to rob prior to or concurrent with the murder.[91]

Davis does not brief the AEDPA standard with regard to this claim, which alone precludes federal habeas relief.  The Court of Criminal Appeals' rejection of this claim was not unreasonable. The jury possessed sufficient facts to find that Davis committed the capital murder in the course of a robbery.  Looking at the evidence in a light most favorable to the jury's verdict, the Court of Criminal Appeals was not unreasonable in finding that sufficient evidence supported Davis's conviction.  This claim is denied.

**C.   Davis's Confession (claims 3 and 4)**

Davis's federal petition raises two claims relating to the

---

[91]Opinion, <u>Davis v. The State of Texas,</u> No. 71,513, Docket Entry No. 32-29 at 5 (citations omitted).

admission of the police statement in which he confessed to the murder.  Davis argues that the police interrogation violated both his Sixth Amendment right to counsel (claim 3) and his Fifth Amendment right against self-incrimination (claim 4).  Davis briefs his Fifth and Sixth Amendment claims together in both his Petition and in his Reply.[92]  Davis's two claims raise separate questions: did Davis validly waive his right to counsel and did he waive both his Fifth and Sixth Amendment rights voluntarily?

### 1.   Background

Before the police knew about their involvement in the Foster murder, the police had arrested Davis and McDonald on August 17, 1991, in connection with the stabbing of a man named Steven Sherman.  Counsel was appointed for Davis relating to that arrest.

The police approached Davis in jail on September 10, 1991, to question him about the Foster murder.  "Shown a photograph of Foster by the detective, [Davis] denied that he knew him and said he wanted to talk to the attorney appointed to represent him in the Sherman case. The detectives ceased their conversation with [Davis] and left."[93]  Davis then contacted police officers on November 19, 1991, and expressed a desire to speak with them about the case.

---

[92]Petition, Docket Entry No. 30 at 57-82; Reply, Docket Entry No. 95 at 1-13.

[93]Supplemental Clerk's Record, Docket Entry No. 32-3 at 4.

Davis waived his rights and provided a statement confessing to the Foster murder.

Davis complains that the police interrogation violated the Fifth and Sixth Amendments, each of which provide distinct protections for criminal suspects. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." McNeil v. Wisconsin, 11 S. Ct. 2204, 2207 (1991). Davis challenges the admissibility of his police statement because, even though he had counsel appointed for the Sherman stabbing, the police "continued to contact him behind counsel's back and attempt to question him. What makes the officers' actions even more offensive is that they were contacted by [the attorney appointed for the Sherman stabbing] who told them he wished to be present during any police questioning."[94] Davis also says that his "waiver was not a valid waiver because it was induced by trickery and deception" because of pressure put on his wife.[95]

Davis also alleges that the police violated his Fifth Amendment rights. The Fifth Amendment ensures a right to remain silent, which an inmate must waive "voluntar[ily] in the sense that it was the product of a free and deliberate choice rather than

---

[94] Id. at 69.

[95] Id.

intimidation, coercion, or deception." <u>Moran v. Burbine,</u> 106 S.
Ct. 1135, 1140-41 (1986).  Davis does not point to any direct
intimidation to himself, but argues that the waiver resulted from
an "elaborate scheme" which the police concocted to put pressure on
McDonald "in order to secure incriminating statements from him."[96]
Davis does not identify any direct threat to McDonald, but instead
apparently refers to the prosecution's initial focus on her as the
possible killer.  Davis argues that, "[k]nowing that [he] would
seek to communicate with his wife who was also jailed, peace
officers initiated continued contact with [his wife] informing her
that all of the evidence pointed to her while none of it pointed to
her husband."[97]  Davis alleges that the police knew that badgering
McDonald would result in him "coming forward in order to exculpate
his wife, prevent her death sentence and inculpate himself."[98]
Davis also alleges that "police overreaching" induced him into
believing his confession would result in immunity for his wife, a
life sentence, and a jail transfer.[99]

2.  <u>Decision on Direct Appeal</u>

[96]Petition, Docket Entry No. 30 at 57, 66.

[97]<u>Id.</u> at 67.

[98]<u>Id.</u>

[99]<u>Id.</u> at 70.

-43-

Davis raised these two claims in his first direct appeal. With regard to the Sixth Amendment claim, the Court of Criminal Appeals easily found that "[a]s the adversarial proceedings against [Davis] had not been initiated, [he] had no Sixth Amendment right to counsel" with regard to the Foster murder.[100]  The Court of Criminal Appeals found that, even though Davis has an appointed attorney on the Sherman stabbing, "the Sixth Amendment is offense-specific" so his "invocation of his Sixth Amendment right to counsel in the unrelated offenses does not carry over to the instant offenses."[101]

Davis's allegations of coercion under the Fifth Amendment fared no better.  Davis's appellate arguments followed two themes. First, Davis argued that the police threats against his wife rendered his own waiver involuntary.  Second, Davis argued that the police only secured his confession pursuant to an improper promise. The Court of Criminal Appeals found no unlawful behavior by police officers.  The Court of Criminal Appeals found no evidence that the police harassed or mistreated McDonald, but rather "[a]s the evidence mounted against [his] wife, the officers['] contact with

_____

[100]Opinion, Davis v. The State of Texas, No. 71,513, Docket Entry No. 32-29 at 9-10.

[101]Id. at 10 (citing McNeil v. Wisconsin, 111 S. Ct. 2204, 2207 (1991) and Maine v. Moulton, 106 S. Ct. 477, 489 n.16 (1985)).

her increased"[102] Instead, Davis's "determination to confess" which "was based upon a desire to protect his wife from prosecution" was a "subjective belief," not a result of pressure or promises.[103]

Without any evidence to support Davis's claim that a police scheme or promise improperly influenced his decisions, the Court of Criminal Appeals easily found that he had made a valid waiver of both his Fifth and Sixth Amendment rights.

### 3.   AEDPA Review

This is one of the few claims in which Davis addresses the AEDPA standard of review.  Because Davis raised these claims on direct appeal, he must show that the state decision was contrary to, or an unreasonable application of, federal law.  See 28 U.S.C. § 2254(d)(1).[104]  The Court of Criminal Appeals was not unreasonable in denying Davis's claim that admission of his videotaped confession violated his Sixth Amendment right to counsel.  The Sixth Amendment right to counsel, which attaches at the "initiation of adversary judicial proceedings," McNeil, 111 S. Ct. at 2207, is

---

[102]Id. at 12.

[103]Id. at 14.

[104]Still, Davis relies on case law about the standard of review that predates AEDPA and asserts that the court must decide questions about the constitutionality of his confession independent of any deference to the state decision.  See Reply, Docket Entry No. 95 at 1-3.

"offense specific," meaning it applies only "to the specific offense with which the suspect has been charged." United States v. Carpenter, 963 F.2d 736, 739 (5th Cir. 1992); see also Texas v. Cobb, 121 S. Ct. 1335, 1340 (2001). In other words, "a defendant's statements regarding offenses for which he ha[s] not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." Cobb, 121 S. Ct. at 1340.

The State did not charge Davis in the instant case until November 26, 1991, after he confessed to the murder. Adversarial proceedings in the Foster case had not initiated when Davis spoke with police officers. That he had an attorney appointed for another charge is of no moment. Davis waived his right to counsel for interrogation relating to the instant offense and cannot show, based on the facts that he developed in state court, that he did not do so involuntarily.

Both Davis's third and fourth claims allege that the State violated his rights by creating a situation where he did not voluntarily give his statement. Davis's arguments depend on showing that circumstances overwhelmed his ability to give up his rights voluntarily. Davis does not identify any direct threat, improper inducement, or deception to himself. Instead, Davis alleges that state actors concocted an elaborate scheme to force a

-46-

confession by pressuring McDonald.  Davis's federal pleadings also rest on his arguments that "'police threats to an accused or *his family* render a confession involuntarily.'"[105]

While it is true that "[t]hreats . . . to somehow burden [a defendant's loved one] until or unless the defendant confesses can raise coercion issues[,]" the concerns "are attenuated when the family member or loved one is plausibly tied to the crime." <u>States v. Hall,</u> 711 F. App'x 198, 202 (5th Cir. 2017); <u>see also Allen v. McCotter,</u> 804 F.2d 1362, 1364 (5th Cir. 1986).  The Court of Criminal Appeals reviewed the evidence that pointed toward McDonald's involvement in the Foster murder and found that as "the evidence mounted against [her], the officer[']s contact increased."[106]  In essence, the Court of Criminal Appeals found that the police did not threaten McDonald to secure Davis's confession, they "were following the only leads they possessed . . . ."[107]  The record does not contain any other evidence that the police concocted a scheme to pressure McDonald while allowing them to communicate.

The Court of Criminal Appeals also rejected Davis's assertion that he confessed because of the State had promised immunity for

---

[105]Reply, Docket Entry No. 95 at 7 (emphasis in original).

[106]Opinion, <u>Davis v. The State of Texas,</u> No. 71,513, Docket Entry No. 32-29 at 12.

[107]<u>Id.</u> at 11.

his wife, a life sentence, and jail relocation.  The testimony in the suppression hearing indicated that no promises to Davis had been made.  Davis himself said during the interrogation that he had not been promised anything.  As the Court of Criminal Appeals observed, the evidence showed that Davis confessed "based upon a desire to protect his wife from prosecution" and any belief about the consequences of that confession was "subjective."[108]

Having dismissed Davis's arguments about a scheme against him and unrealized promises that induced his confession, the Court of Criminal Appeals found that the State had honored Davis's rights, that he was the one who approached the police about making a statement, that he was repeatedly advised of his rights, and that he waived them.  Davis has not shown that the state court's review of his claims was unreasonable.  Davis has not met the AEDPA standard regarding claims 3 and 4.  The court will deny those claims.

D.   **Photographic Identification Procedures (claims 5 and 6)**

In his fifth and sixth claims, Davis argues that the trial court violated his Fifth, Sixth, and Fourteenth Amendment rights by admitting into evidence "photographic identification procedures

---

[108]Id. at 14.

which were . . . unduly suggestive . . . ."[109]   This claim involves
the identification made by Ralph Ulrich who was working at the Pik
'N Pak club on August 10, 1991.   Davis acknowledges that "[a]t
first blush, it would appear that Ulrich's pretrial identification
of [Davis] is constitutionally sound: Detective [Charles] Smith
attempted to secure an array of similar participants and . . .
avoided any undue suggestion by the peace officers."[110]   Davis,
however, argues that "once that thin veneer is stripped away, it
becomes apparent that Ulrich's identification is based not on
[Davis's] face but on a tattoo, which was attributed to [him]."[111]
Davis says that "[b]ecause of the manner in which the single tattoo
was identified, it surely meant that [he] would be identified as
the perpetrator."[112]

The Court of Criminal Appeals rejected these claims on direct
appeal.   Davis does not challenge the adjudication of this claim
under the AEDPA standard.   Instead, Davis merely relies on pre-
AEDPA law to argue that the state court's decision warrants no
deference.[113]   Davis's failure to brief the AEDPA standard is alone

---

[109]Petition, Docket Entry No. 30 at 82.

[110]Id. at 83.

[111]Id. at 83.

[112]Id. at 86.

[113]Id.

a sufficient basis to deny this claim.

Even so, the record contains significant details about Ulrich's identification that do not indicate that the police used impermissibly suggestive procedures. While Ulrich initially told police that he "was kind of shocked" when he found out about Foster's murder and "didn't have anything really to tell" them,[114] he later gave the police a description which matched Davis and his wife. Ulrich specifically mentioned the Nazi tattoo on the man's exposed chest.[115]

On September 10, 1991, a police officer presented Ulrich with two photo spreads, each with six pictures, to see if he could identify the couple that the victim left with that night. Ulrich "tentative[ly]" picked out both Davis and McDonald from the respective arrays.[116] When Ulrich pointed out the picture of Davis, however, he stated that it "looked like the subject, but he wasn't sure at that time" and "that he recalled the tattoo more than he did the face."[117] Ulrich said "[h]e would be more certain" if he saw

---

[114]Statement of Facts-Vol. 17 [1992], Jury Trial, Nos. 32-19 at 134.

[115]Statement of Facts-Vol. 17 [1992], Jury Trial, Nos. 32-19 at 127, No. 32-20 at 80, No. 32-21 at 38.

[116]Opinion, Davis v. The State of Texas, No. 71,513, Docket Entry No. 32-29 at 17, n. 10.

[117]Statement of Facts-Vol. 18 [1992], Jury Trial, Docket Entry No. 32-20 at 83-84,87,170.

the tattoo.[118]  On September 11, 1992, the police officer visited Ulrich again, this time with a photograph he had taken of Davis's tattoo.[119]  The photograph of the tattoo "was of [Davis's] torso, neck, and the portion of his head below the nose.  The majority of [Davis's] face was not visible."[120]  Ulrich recognized the tattoo as the one on the man who left with the victim.[121]  Ulrich testified at trial that, even if he had not seen the photo spreads, he would have been able to identify Davis in court.[122]

On direct appeal from Davis's 1992 conviction, the Court of Criminal Appeals did not find any impermissibly suggestive factor in Ulrich's identification of Davis.  As noted by the Court of Criminal Appeals, Davis focused on weaknesses in Ulrich's identification, which are properly addressed through cross-examination.[123]  In his federal briefing, Davis focuses his complaints about the fact that the police presented Ulrich with a photograph of his tattoo.  According to Davis, a "better procedure" would have been to place the photograph of his tattoo into an array

---

[118]Id. at 169.

[119]Id. at 87.

[120]Opinion, Davis v. The State of Texas, No. 71,513, Docket Entry No. 32-29 at 17, n. 11.

[121]Statement of Facts-Vol. 18 [1992], Jury Trial, Docket Entry No. 32-20 at 165-66.

[122]Id. at 146.

[123]Opinion, Davis v. The State of Texas, No. 71,513, Docket Entry No. 32-29 at 17.

of photographs containing other tattoos.[124]  Davis, however, has not provided any constitutional law requiring a "tattoo lineup" in similar circumstances.

Further, Davis's argument ignores the fact that Ulrich had tentatively identified him as the perpetrator in the initial photo spread and then positively did so in court.  Davis does not raise any serious objection to the initial identification.  While Ulrich's initial identification was somewhat tentative, Ulrich testified that he would have been able to identify Davis in court even if he had not seen the photo spreads.  With that background, the state court was not unreasonable in finding no constitutional error.  The court, therefore, denies Davis's challenges to Ulrich's identification.

**E.   Improper Prosecutorial Argument (claim 7)**

In his seventh ground for relief, Davis argues that the prosecution made improper arguments during closing arguments in his 1992 guilt/innocence trial.  Davis complains that the State's attorney made statements during closing "which struck [him] over the shoulders of counsel" and otherwise violated the Fourteenth Amendment's due process clause.[125]  Respondent argues that the

_____

[124]Petition, Docket Entry No. 30 at 83.

[125]Id. at 71.

-52-

challenged prosecutorial arguments were not improper.[126] Davis's Reply does not discuss Respondent's arguments.

A petitioner raising a claim of prosecutorial misconduct carries a "substantial burden." United States v. Diaz-Cameron, 915 F.2d 951, 956 (5th Cir. 1990). "A prosecutor's improper argument will, in itself, exceed constitutional limitations only in the most egregious cases." Ortega v. McCotter, 808 F.2d 406, 410 (5th Cir. 1987) (quotation omitted). A prosecutor's remarks will provide grounds for habeas relief if they "evince either persistent and pronounced misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred." Harris v. Cockrell, 313 F.3d 238, 245 (5th Cir. 2002) (quotation omitted).

On direct appeal from his conviction, Davis challenged a section of closing arguments in which trial counsel objected three times to the prosecutor's remarks.[127] In each case, Davis argued that the arguments "were strikes at [him] through defense

---

[126]Answer, Docket Entry No. 88 at 199-209.

[127]Respondent points out that Davis's state court briefing did not include two of the allegedly improper comments which he identifies on federal review. To exhaust a federal constitutional claim, an inmate must "fairly present[]" his federal claim "to the highest state court." Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998). Even though Davis did not challenge those comments in state court, federal relief is unavailable for the same reasons discussed above.

counsel."[128]   The Court of Criminal Appeals accepted the State's argument that the remarks were "not directed at defense counsel but rather [were] directed at defense counsel's argument," and thus were permissible under state law.[129]

This court has reviewed the challenged statements and, considering them in the context of the whole trial, they did not render Davis's trial fundamentally unfair.  The state courts found that the remarks were not inappropriate under state law.  While this court's focus is on federal law, the state court's reasoning applies with full force in this case.  Davis has not provided any counterargument to Respondent's detailed consideration of the allegedly improper comments.  As extensively discussed by Respondent, the State's comments were not pervasive or pronounced.  Given the strong evidence of Davis's guilt, the challenged comments did not play a critical or highly significant factor in the jury's determination.  Davis has not shown that he merits federal habeas relief on this claim.


**F.   Texas' Habeas Remedies (claim 8)**

In his eighth claim for relief, Davis asserts that Article

---

[128]Opinion, Davis v. The State of Texas, No. 71,513, Docket Entry No. 32-29 at 21.

[129]Id. at 23.

11.073 of the Texas Code of Criminal Procedure[130] entitles him to a new trial because "new DNA technology" excludes him as a contributor to two hairs found at the crime scene.[131]   The 2017 testing involved DNA samples from hair found in the victim's hand and from a bloodstain found on his pants.   The results did not match Davis's DNA.   Davis says that the results create "more than a reasonable doubt of [his] guilt."[132]

In his ninth state habeas application, Davis argued that the new DNA testing exonerated him under Tex. Code Crim. Pro. art. 11.073.   The Court of Criminal Appeals applied its procedural law and dismissed this claim without considering the merits.   Davis claims that the Court of Criminal Appeals should have let him litigate the issue under article 11.073.

Insofar as Davis intends to present the same claim he raised in his ninth state habeas application, Respondent argues that a

---

[130]In 2013, the Texas state legislature enacted Texas Code of Criminal Procedure article 11.073, "which allows a defendant to obtain post-conviction relief based on a change in science relied on by the State at trial."   Ex parte Chaney, 563 S.W.3d 239, 255 (Tex. Crim. App. 2018).   Under that statute, habeas review is possible for "relevant scientific evidence" that "was not available at the time of the convicted person's trial" and "had the scientific evidence been presented at trial . . . the person would not have been convicted." Tex. Code Crim. Pro. Art. 11.073.

[131]Petition, Docket Entry No. 30 at 92.

[132]Id. at 117-18.

procedural bar forecloses federal review.[133]  Davis makes no effort
to overcome the procedural bar.

      At any rate, Davis's claim is without merit.  Davis's wide-
ranging argument drifts from general concerns about the use of
confessions in capital cases, to exonerations in other
jurisdictions, to perceived weaknesses in the State's case, to
questions raised by the new DNA evidence.  Davis's lengthy,
convoluted briefing on this claim leaves its precise constitutional
foundation unclear.  If Davis's argument is that the state courts
failed to provide relief under article 11.073, then he only alleges
a violation of state law, which has never provided grounds for
federal constitutional relief.  If Davis intends to argue that new
DNA evidence exculpates him, then he presents another version of
his actual-innocence claim that is not a valid basis for federal
habeas corpus review.  If Davis alleges that the Court of Criminal
Appeals denied his due process rights by failing to give adequate
consideration to his DNA under article 11.073, he likewise fails to
present a cognizable federal ground for relief.[134]  In sum, Davis
does not identify a cognizable basis for federal relief on this

---

[133]Answer, Docket Entry No. 88 at 210.

[134]See Pennsylvania v. Finley, 107 S. Ct. 1990, 1992 (1987) ("States
have no obligation to provide postconviction relief . . . .");
Hallmark v. Johnson, 118 F.3d 1073, 1080 (5th Cir. 1997)
("[I]nfirmities in state habeas proceedings do not constitute
grounds for relief in federal court.").

claim.   The court denies this claim.

## G.   **False DNA Evidence (claim 9)**

In his ninth ground for relief, Davis contends that "the State of Texas Department of Public Safety DNA lab has recanted its entire DNA testimony from [his] 2011 punishment phase re-trial, and false DNA testimony was therefore presented in Davis's punishment phase re-trial."[135]   Davis bases this claim on a letter his attorneys received from the DPS Crime Lab in 2017.   Based on that letter, Davis argues that "his right to due process under the Fifth, Eighth, and Fourteenth Amendment[s]" was violated by the State's use of false evidence to obtain his death sentence.[136] Davis's false-evidence claim involves the extraneous Blaylock murder from his 2011 retrial.

### 1.   Background

Davis bases this claim on testimony and evidence about an extraneous murder which the State presented in his 2011 retrial. Between the time of his first prosecution and his retrial, the State developed evidence linking Davis to a murder that occurred in 1988.   The State alleged that in 1988 Davis "robbed the Beverage

---

[135]Petition, Docket Entry No. 30 at 118.

[136]Id. at 129.

-57-

Barn in Mineral Wells, [Texas,] abducted and shot the clerk, nineteen year-old Keith Blaylock, left his body in a remote area, and abandoned Blaylock's truck nearby—leaving a stocking mask on the seat of the truck."[137]   The State relied heavily on a witness, Thomas Cason.  Cason testified at trial that he gave Davis a loaded .22 caliber pistol to use in the robbery.  Cason also cut off a leg of his grandmother's pantyhose and gave them to Davis so he could cover his face.  Cason drove Davis to the Beverage Barn.  A few hours later, Cason met Davis who was driving Blaylock's truck.  Davis showed Cason some personal items belonging to Blaylock.  Physical evidence connected Davis to the crime, such as the cut-off pantyhose which was found in the later abandoned truck.

At trial, the parties referred to the pantyhose as a "stocking mask."  The State presented DNA evidence relating to the stocking mask.  Uyen Henson, a forensic scientist with the Texas Department of Public Safety Crime Laboratory, testified that he was "surprised" that he "was able to obtain some DNA" from the mask because it was "degraded" from being "old and it was starting to break down."[138]   The mask contained a mixture of female and male

---

[137]Postconviction Writ, Findings of Fact, Conclusions of Law, and Order, Docket Entry No. 34-57 at 214.

[138]Reporter's Record-Vol. 23, Punishment Proceedings, Docket Entry No. 33-30 at 156.

DNA.[139]  Henson explained "the probability of selecting an unrelated person at random who could be a contributor to this mixture . . . among the Caucasian population" was "758,200."  Henson did not confirm that Davis had been a contributor to the DNA material on the mask.  Instead, Henson testified that Davis "could not be excluded" as a contributor to the DNA.[140]

Davis first raised a challenge to the DNA evidence in his ninth state habeas application.  Davis based his claim on a letter his attorneys received from the Texas Forensic Science Commission in 2015.  The letter encouraged criminal law practitioners "with a currently pending case involving a DNA mixture in which the results could impact the conviction" to "consider requesting confirmation that Combined Probability of Inclusion/Exclusion . . . was calculated by the laboratory using current and proper mixture interpretation protocols."[141]  DPS attempted to reinterpret the DNA data from the Blaylock murder in 2017. Melissa Haas, a supervisor for the Texas DPS Crime Lab, provided a letter that described the efforts at reassessing the data.  Haas said that, under the current DPS protocols, they could not interpret any DNA profiles and the

---

[139]Id. at 165.

[140]Id. at 168.  In closing arguments, the defense characterized it as "very weak DNA in this case" because "this DNA match has got multiple people" and it was "not an identification."  Reporter's Record-Vol. 28, Punishment Proceedings, Docket Entry No. 33-35 at 56-57.  The State's closing argument only mentioned the stocking mask and DNA briefly.

[141]Subsequent Application For Writ Of Habeas Corpus Filed Pursuant To Article 11.071, Section 5, Docket Entry No. 34-80 at 51.

sample was also "no longer suitable for reinterpretation."[142]

Davis's ninth claim argues that the DPS letter proves that the State presented false testimony about DNA evidence at trial. Davis raised this claim in his ninth state habeas application. The Court of Criminal Appeals did not address the merits at any length, but dismissed this claim. Before turning to the merits, the court discusses whether Davis defaulted this claim in state court.

2.   Procedural Bar

The Court of Criminal Appeals dismissed Davis's ninth habeas application under Tex. Code Crim. Pro. Art. 11.071 § 5(a). Respondent argues that the Court of Criminal Appeals' action results in a federal procedural bar.[143] The Fifth Circuit has held that article 11.071 § 5(a) is generally an adequate and independent state procedural bar to federal review. See Barrientes v. Johnson, 221 F.3d 741, 759 (5th Cir. 2000). The court must decide whether it is one in this case.

In response to Respondent's procedural-bar argument, Davis cites law in which the Fifth Circuit has found that the Court of Criminal Appeals' procedural determination in some narrow

───────────────

[142]Answer, Docket Entry No. 88 at 219.

[143]Id. at 215.

-60-

circumstances is not independent of federal law.[144]  Davis then says
that "[b]ecause this state procedural default fairly appears to
rest primarily on federal law, or is interwoven with federal law,
it is not independent of federal law" and "this Court's review of
the claim after the State's procedural default of the claim is *de
novo.*"[145]

The Court of Criminal Appeals can only authorize the filing of
successive habeas proceedings after an inmate complies with the
strict demands of Texas' abuse-of-the-writ doctrine, codified at
Tex. Code Crim. Pro. art. 11.071 § 5(a).  Under section 5(a), an
inmate can proceed with a successive habeas action only if he shows
applicable new law or facts (§ 5(a)(1)); actual innocence of his
conviction (§ 5(a)(2)); or actual innocence of the death penalty (§
5(a)(3)).  The question of whether section 5(a) results in a
federal procedural bar is usually a simple one.  The Fifth Circuit
generally considers a dismissal under 5(a)(1) to be an adequate and
independent basis to bar federal review.  See Speer v. Lumpkin, 824
F. App'x 240, 246 (5th Cir. 2020).

The Fifth Circuit, however, has recognized a narrow category
of cases in which the Court of Criminal Appeals' dismissal of a
claim was not "independent" of federal law because it had actually

---

[144]Reply, Docket Entry No. 95 at 19-24.

[145]Id. at 27.

considered the merits.  Balentine v. Thaler, 626 F.3d 842, 853 (5th
Cir. 2010) (quoting Rivera v. Quarterman, 505 F.3d 349, 359 (5th
Cir. 2007)); see also Davila, 888 F.3d at 188; Rocha v. Thaler, 626
F.3d 815, 837 (5th Cir. 2010).  The Court of Criminal Appeals
created this category of cases when it began using a "two-step
inquiry . . . to determine whether dismissal of [an intellectual-
disability Atkins] claim is required" under section 5(a)(1).  In re
Davila, 888 F.3d 179, 188 (5th Cir. 2018) (citing Rocha, 626 F.3d
at 833).  In the first step, the Court of Criminal Appeals bars a
claim when "the factual or legal basis for the new claim was
unavailable as to previous applications."  Davila, 888 F.3d at 188;
see also Canales v. Stephens, 765 F.3d 551, 565 (5th Cir. 2014).
If the Court of Criminal Appeals stops at this step, the dismissal
does not reach the merits and results in a procedural bar.  The
decision is not procedural, however, if the Court of Criminal
Appeals proceeds to the second step and asks if the inmate made a
"prima facie showing" of "sufficient specific facts" to "merit
further review."  Rivera v. Quarterman, 505 F.3d 349, 359 (5th Cir.
2007).  When the Court of Criminal Appeals engages in its "prima
facie" review, its decision rests on the merits of the claim and
will not qualify to bar federal review.  See Busby v. Davis, 925
F.3d 699, 709 (5th Cir. 2019).

This narrow category of cases, however, only exists when "[i]n
some form, the state court has [made] a fair indication that the

-62-

merits of the claims were reached." <u>Balentine,</u> 626 F.3d at 854. Here, the Court of Criminal Appeals' resolution of the claim was unclear. On one hand, the Court of Criminal Appeals "dismissed" Davis's claims, signaling a procedural action. <u>See Ex parte Torres,</u> 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (indicating that a "denial" signifies adjudication on the merits, while "dismissal" reflects a claim declined on grounds other than upon the merits). On the other, the Court of Criminal Appeals found that Davis had not made a "prima facie showing" on federal claim 9. This is "merits-based language" which sometimes indicates that the Court of Criminal Appeals' decision was not independent of federal law. <u>Davila,</u> 888 F.3d at 189. The Court of Criminal Appeals' decision contains contradictory signals as to whether it was a procedural or merits-based decision.

A federal court may help clear up any confusion in an unclear order by looking at a petitioner's state-court briefing. <u>See Canales v. Stephens,</u> 765 F.3d 551, 565 (5th Cir. 2014). Davis's briefing specifically argued that federal claim nine (state claim two) was previously "unavailable" under section 5(a)(1).[146] Davis's

---

[146]Postconviction Writ, Subsequent Application for Writ of Habeas Corpus Filed Pursuant to Article 11.071, Section 5; Exhibits, Docket Entry No. 34-80 at 63. Davis asked the state courts to allow review of federal claim eight (state claim one) under article 11.073. <u>See id.</u> at 21. Davis did not argue that the other claims he raised in his ninth habeas application were previously unavailable, thus the Court of Criminal Appeals could dismiss then on those
(continued...)

briefing did not ask the Court of Criminal Appeals to allow successive review based on a prima facie showing. Even so, the record is unclear as to whether the Court of Criminal Appeals decided this claim under the availability or prima facie prong of its section 5(a)(1) analysis. Given the lack of clarity in the record, and the fact that this claim is conclusively without merit, the court will consider the merits of claim nine.

### 3.   Federal Review

Davis's petition leaves the constitutional basis for his claim somewhat unclear. Davis refers to his claim as involving "false DNA testimony."[147]   Petitioners generally bring false-evidence claims under general due process jurisprudence flowing from <u>Giglio v. United States,</u> 92 S. Ct. 763 (1972) and <u>Napue v. Illinois,</u> 79 S. Ct. 1173 (1959). To demonstrate a constitutional violation based on the State's use of false evidence or testimony, a habeas petitioner must show that "(1) the testimony was actually false, (2) the state knew it was false, and (3) [it] was material." <u>Faulder v. Johnson,</u> 81 F.3d 515, 519 (5th Cir. 1996).

In his Reply, however, Davis clarifies that he actually bases his claim on the Eighth Amendment and <u>Johnson v. Mississippi,</u> 108

---

(...continued)
grounds alone.

[147]Petition, Docket Entry No. 30 at 118.

S. Ct. 1981 (1988).[148]   It is uncertain why Davis has chosen to bring his arguments under the Johnson framework.   In Johnson, "the Supreme Court considered a death sentence that was predicated on the jury's finding of an aggravating factor—a prior violent felony conviction—where that prior conviction was vacated after his capital trial."   Rhoades v. Davis, 914 F.3d 357, 375 (5th Cir. 2019).   Most "cases that have relied upon Johnson" do so "to determine whether evidence of a criminal conviction or conduct may be properly admitted at sentencing."   Hernandez v. Johnson, 213 F.3d 243, 252 (5th Cir. 2000).   In essence, Johnson involved "a materially inaccurate criminal conviction" rather than "purportedly materially inaccurate testimony" such as is issue in this case. Id.

Davis has not identified any federal precedent indicating that the Supreme Court in Johnson intended to create an Eighth Amendment false-evidence claim which differed from the Napue/Giglio line of cases.   The structural concern in Johnson differs the fact-intensive analysis required in traditional false-evidence claims.[149]

---

[148]Reply, Docket Entry No. 95 at 35-41.

[149]Davis possibly relies on Johnson to evade the "knowing" requirement of the Napue/Giglio line of cases. Reply, Docket Entry No. 95 at 40.   Assuming that Johnson was actionable in a similar context, the Fifth Circuit has noted that such a claim would not impose a "knowing" requirement on the State.   Hernandez, 213 F.3d at 252.   Nevertheless, to sustain a claim under Johnson a habeas petitioner would still need to establish that the testimony was "false and material."   Hernandez, 213 F.3d at 252.

But even approaching the question from the <u>Johnson</u> framework, Davis has not shown that the testimony was false or material. Davis does not point to any statement by the State's DNA expert that was objectively false at the time of trial. Davis, in fact, overstates the findings from the letter that DPS sent to his attorney. The DPS letter did not admit any error in the evidence that the State relied on at trial. The statement by the Texas Forensic Science Commission that it "can no longer interpret the profile" because under "the current protocols the mixture is now too complex" is not a confession that the trial evidence was false.[150] Instead, the 2017 reassessment meant that reinterpretation of the DNA material was not possible. The revised DNA testing does not exculpate Davis of the Blaylock murder, it only indicates that retesting was not possible.

Davis cannot show that any error in the DNA testing was material. The DNA testimony was only one piece in a highly incriminatory case for the Blaylock murder. Cason's testimony contained numerous facts that strongly pointed to Davis as Blaylock's killer. For example, Cason testified that he had given the stocking cap to Davis, that Davis possessed evidence taken from Blaylock, and that Davis got rid of evidence relating to the murder. With Cason's testimony linking Davis to the stocking cap

---

[150]Petition for a Writ of Habeas Corpus Exhibits, Docket Entry No. 40-1 at 414.

-66-

and the crime, the jury would see little difference between testimony about testing results that could not exclude Davis as a contributor to the DNA and testimony that the DNA was untestable. The 2017 reassessment left Davis in much the same position as he was in the second punishment hearing—no DNA definitively connected him to the stocking mask, but Cason's testimony did.

Moreover, the DNA evidence was only one minor piece of a highly incriminating case for a death sentence. One jury had already returned a death sentence for Davis without considering the Blaylock murder. At retrial, the State argued for a sentence of death based on Davis's extensive criminal history. Beginning with a burglary of a habitation at age fifteen, Davis committed numerous crimes as a juvenile. Despite efforts to help Davis, he did not reform his character. Davis was expelled from junior high school after various complaints about his violent temper. At age eighteen, Davis was convicted for delivery of marijuana. While on probation Davis committed various violent acts and, eventually, he was sent to prison. Davis later absconded when assigned to a parole facility, resulting in a prison sentence for rape. Davis abused a girlfriend and choked his mother. Davis shot at people. Davis tied up and beat a man during a robbery. Davis assaulted his wife. The State showed that Davis and his wife were arrested only days after the Foster murder when they attempted to kill another man. While incarcerated, Davis joined racist gangs, behaved

poorly, possessed weapons, refused to obey orders, threatened officers, and possessed a cell phone.   The State also presented evidence about the sheer brutality and viciousness of the murder for which Davis had been convicted.   Within the whole context of the penalty retrial, and given the fact that numerous other facts connected Davis to the Blaylock murder without the DNA evidence, Davis has not shown a reasonable likelihood that the result would have been different.

In conclusion, Davis has not shown that his DNA claim entitles him to federal habeas relief.   The court will deny this claim.

## H.   **Brady** (claim 10)

Under a heading stating that "the state violated Brady v. Maryland by not disclosing the fact that McDonald had been suspected of other home invasions involving white supremacists,"[151] Davis contends that the State did not disclose: (1) "offense reports which describe McDonald's criminal conduct and association with white supremacist organizations" including "a home invasion by McDonald and other members of her 'skinhead' gang"[152] and (2) "three flyers in [the victim's] jacket found near his body."[153]

In Brady v. Maryland, 83 S. Ct. 1194, 1196 (1963), the Supreme

---

[151]Petition, Docket Entry No. 30 at 134.

[152]Id. at 138.

[153]Id. at 141.

Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." "There are three components of a true Brady violation: (1) the evidence . . . must be favorable to the accused; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." Canales v. Stephens, 765 F.3d 551, 574 (5th Cir. 2014). The court will first address whether this claim is procedurally barred and then discuss the merits.

　　　1.　Procedural Bar

Davis raised this claim in his ninth state habeas application.[154] As with claim 9, Davis argues that the Court of Criminal Appeals' rejection of this claim was interwoven with federal law, meaning that it cannot serve as a procedural bar for the purposes of federal review. Unlike his ninth claim, Davis did not argue in state court that his Brady claim was previously unavailable under 5(a)(1). Davis instead asked the Court of Criminal Appeals to allow successive review under "subsections (2) and (3) [of Article 11.071]," which do not include the same two-

---

[154]Subsequent Application for Writ of Habeas Corpus Filed Pursuant to Article 11.071, Section 5, Docket Entry No. 34-80 at 69-83.

step process which interweaves federal law into the procedural decision.[155] There is no reason to assume that the jurisprudence allowing review under section 5(a)(l)'s two-part test applies to this claim.

Some confusion still exists because the Court of Criminal Appeals made the blanket statement that Davis had not made a "prima facie showing" on his claims but also dismissed his ninth application.[156] Also, the Fifth Circuit has not spoken with one voice concerning whether section 5(a)(2) and (3) are an adequate and independent basis to bar federal review.[157] This court's review, however, would travel the same path whether the Court of

_____

[155]Postconviction Writ, Docket Entry No. 80 at 72.

[156]Opinion, Docket Entry No. 82 at 5.

[157]On one hand, the Fifth Circuit has said that "when the [Court of Criminal Appeals] determines that a successive state habeas application does not satisfy § 5(a)(3) . . . the [Court of Criminal Appeals] need not, and does not, consider the merits of the underlying federal constitutional claim." Rocha v. Thaler, 626 F.3d 815, 819 (5th Cir. 2010); see also Butler v. Stephens, 625 F. App'x 641, 659 (5th Cir. 2015) (finding a Strickland claim procedurally barred after a dismissal under 5(a)(3)); Adams v. Thaler, 421 F. App'x 322, 331 (5th Cir. 2011). Elsewhere, however, the Fifth Circuit has said that, "[i]f the [Court of Criminal Appeals] dismisses the petition under § 5(a)(2) or § 5(a)(3), this Court can also review it under the standard in § 2254(d)," which suggests that it has adjudicated the merits of a petitioner's claims. Canales v. Stephens, 765 F.3d 551, 565 (5th Cir. 2014) (looking at various claims but still finding them procedurally barred); see also Busby v. Davis, 925 F.3d 699, 710 (5th Cir. 2019) (finding that dismissal of an Atkins claim under 5(a)(3) "necessarily considers the merits of a federal constitutional claim" and is thus "not procedurally defaulted, as that concept has been expressed in federal decisions . . . .").

-70-

Criminal Appeals dismissed this claim or engaged with the merits. Davis alleges that he can show "cause" and "prejudice" to overcome the procedural bar because the State suppressed evidence.[158] "Cause to excuse a procedurally defaulted <u>Brady</u> claim parallels the suppression component of a <u>Brady</u> claim, and prejudice parallels materiality." <u>Medina v. Lumpkin,</u> ___ F. App'x ___, 2024 WL 3833291, at *13 (5th Cir. Aug. 15, 2024). Any analysis of whether Davis can overcome the procedural bar necessarily addresses the substance of this <u>Brady</u> claim.

For the reasons discussed below, the court finds that Davis's <u>Brady</u> claim lacks merit, under either a procedural or substantive review. The court will review the alleged suppression of offense reports and promotional flyers separately.

### 2.   Offense Reports Mentioning Tina McDonald

According to Davis, the State did not turn over a report from the Pasadena Police Department showing that McDonald was suspected of committing a different home-invasion assault in the company of other skinheads approximately six months before Foster's murder. As described by Respondent,

> [r]ecords from the Pasadena Police Department indicate that the group went to an apartment looking for an individual named Springer that owed money; McDonald knocked on the door and was allowed inside by Springer's

---

[158]Reply, Docket Entry No. 95 at 83-102.

> roommate; approximately fifteen people followed her and
> started attacking the roommate thinking he was Springer;
> McDonald yelled "That's not him" and the suspects stopped
> beating the victim. No charges were filed against
> McDonald.[159]

The records show that the District Attorney's Office "would not

accept any charges against Tina McDonald" because she "was given

permission to enter the apartment, and the fact that . . . neither

the victim nor the witness saw Tina assault the victim . . . ."[160]

Davis argues that the State did not turn over the Pasadena police

reports prior to his 1992 trial.[161]

Davis does not allege any direct connection between the

Pasadena home invasion and the Foster murder. Davis, however,

claims that the police records could have supported a theory that

McDonald may have killed Foster with the aid of other skinheads.

---

[159]Answer, Docket Entry No. 88, 164-65 (citations omitted).

[160]Exhibit 1 State Successor Writ I Exhibits-Claim 3 Brady Exhibits
(1-9), Docket Entry No. 40-2 at 12.

[161]Davis concedes that the defense possessed the Pasadena offense
report prior his 2011 retrial. See Petition, Docket Entry No. 30
at 137. While the defense otherwise tried to attribute the murder
to McDonald, neither party introduced the Pasadena police records
into evidence or otherwise relied on them the 2011 retrial. Davis
does not allege the Pasadena police reports themselves would have
been admissible in the 1992 trial. McDonald was not a witness at
the 1992 trial and was never charged in the instant offense. Davis
has not proposed any means by which the allegedly suppressed police
report itself could have come before jurors. Davis, instead,
speculates that the police report would have led to investigative
avenues which would have, apparently, resulted in some kind of
admissible evidence inculpating McDonald.

Davis describes the value the defense would have found in the Pasadena police report as follows:

> 1) the fact that there are different types of clubs of skinheads; 2) the fact that [McDonald] belonged to and ran with the violent, drug-using, homicidal club; 3) the fact that there are witnesses who had knowledge of their criminal activities and even lived with some of them; 4) the fact that McDonald associated with individuals included alternate suspects, such as Bryan Falconer, or Mike Woodworth; 5) that Bryan Falconer had a reputation of being "bad news."[162]

Davis also says that "[t]he withheld offense report also made another revelation . . . that this violent Skinhead group all hang out at the Axiom Club."[163] Davis contends that the information would have been useful because, as the Pasadena offense report was found in files relating to the Foster murder, it suggests that McDonald and other skinheads were suspects in the instant case.

Respondent's arguments focus on <u>Brady's</u> materiality prong. The court, however, observes that information about McDonald's earlier crime may have been available to Davis. Information that a criminal defendant can easily discover is not "suppressed" or "withheld" within the meaning of <u>Brady</u>. <u>See</u> <u>United States v. Brown,</u> 650 F.3d 581, 588 (5th Cir. 2011) (finding that to have been "suppressed" the evidence must not have been discoverable through the defendant's due diligence). A connection to skinhead culture was present throughout the prosecution. Trial counsel questioned

---

[162]Reply, Docket Entry No. 95 at 96.

[163]<u>Id.</u> at 97.

witnesses in the 1992 trial about McDonald's violent acts with large groups of skinheads. The defense knew that charges were pending against McDonald for auto theft, attempted murder, aggravated robbery, and credit card abuse.[164] Davis knew about his wife's former boyfriend Bryan Falconer who likely participated in the Pasadena home invasion with McDonald.[165] Davis knew that his wife and other skinheads frequented clubs such as Axiom.[166]

Elsewhere, Davis has conceded that a diligent attorney could have developed information about McFarland's association and crimes with other skinheads.[167] In Davis's seventh state habeas application, he raised a <u>Strickland</u> claim which, essentially, concedes that material similar to (if not identical to) that in his

---

[164]<u>See</u> Statement of Facts-Vol. 4 [1992], Docket Entry No. 32-6 at 221.

[165]Statement of Facts-Vol. 21 [1992], Docket Entry No. 32-23 at 169-70. The Pasadena police reports refer to the involvement of someone with the surname Falconer, but the police initially thought his surname was Faulkner. <u>See</u> Sealed Exhibits, Docket Entry No. 40-2 at 8, 11. The parties have not discussed whether the Pasadena police reports refer to McDonald's former boyfriend.

[166]Statement of Facts-Vol. 19 [1992], Docket Entry No. 32-21 at 42.

[167]In his seventh application, Davis argued that the defense attorneys in his second trial were "ineffective for not presenting evidence regarding Tina McDonald's violent and aggressive character" which included assaults committed with her former boyfriend, skinhead Bryan Falconer. <u>See</u> 11.071 Application for Writ of Habeas Corpus, Docket Entry No. 34-53 at 60, 63. Davis has not explained why the information was not equally available to his attorneys in 1992.

federal <u>Brady</u> claim was available before any disclosure of the Pasadena police reports. The court questions whether Davis has shown that trial counsel could not have uncovered information about the Pasadena crime.[168]

But even assuming that the information was both favorable to Davis and suppressed, Respondent persuasively argues that it was not material.[169] "[E]vidence is 'material' within the meaning of <u>Brady</u> when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." <u>Cone v. Bell</u>, 129 S. Ct. 1769, 1782 (2009). Conjecture and speculation mark the path from the Pasadena police report to the arguments in Davis's tenth claim. Davis does not allege any direct connection between the Pasadena home invasion and Foster's murder. The record shows that McDonald was present during the Foster murder. Any suggestion that other skinheads committed the Foster murder because McDonald associated with them is sheer speculation. Davis has not pointed to any evidence positively identifying any skinhead friend who allegedly committed the Foster murder with her. The Pasadena crime does not provide any insight

---

[168]The Court of Criminal Appeals found in the related <u>Strickland</u> claim that trial counsel "was put on notice that Tina McDonald 'would bury' [Davis] with information about criminal acts if she were attacked; that such tactic would not help [Davis] and would likely backfire . . . ." <u>See</u> Postconviction Writ, Findings of Fact and Conclusions of Law, and Order, Docket Entry No. 34-57 at 224.

[169]Answer, Docket Entry No. 88 at 224.

into whether or not Davis fabricated his confession, which was the most important evidence against him.  At best, the police report provides a challenge to a non-testifying co-defendant's character through her involvement in an unrelated offense six months before Davis's crime.

In light of all the evidence, the court finds that Davis has not shown that the Pasadena police report was material as understood by Brady.  See Strickler v. Greene, 119 S. Ct. 1936, 1948 (1999).  Whether considered under the cause-and-prejudice test or on the merits, the court finds that Davis has not shown that his Brady claim relating to McDonald's crimes has arguable merit.

### 3.    The Promotional Flyers

Davis also contends that the State suppressed promotional flyers that were found in a jean jacket near the victim's body. Davis says that the State suppressed "six promotional flyers, or advertisements, for various clubs including four from the Axiom Club and two from the Pik 'n Pak."[170]  Davis, however, has never presented his allegations about the promotional flyers to the state courts.  Davis's Brady claim is unexhausted insofar as it relates to the promotional flyers.

Alternatively, Davis has not shown that this portion of his

---

[170]Id. at 226.

<u>Brady</u> claim merits habeas relief. Respondent contends that the flyers were not kept from the defense. At trial, City of Humble Police Detective Charles Smith testified that a "bunch of flyers, advertisement type things for bands" were found at the crime scene.[171] Detective Smith testified that one of the flyers was in the courtroom and the others were "in a box in the next room."[172] In fact, one of the flyers was admitted into evidence.[173]

Rather than being suppressed, the flyers were mentioned at trial and were present in the courthouse. Nothing in the record demonstrates that trial counsel could not have had access to the flyers, had the defense so desired. <u>See United States v. Brown</u>, 628 F.2d 471, 473 (5th Cir. 1980) (finding that "the defendant has no <u>Brady</u> claim" when "information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of diligence").

More important, Respondent argues that any alleged suppression of the flyers was not material.[174] Davis says that the value in the flyers was that four of them came from the Axiom club. Davis links the flyers to information in the Pasadena police report that

---

[171]Statement of Facts-Vol. 18 [1992], Jury Trial, Docket Entry No. 32-20 at 76.

[172]<u>Id.</u> at 22.

[173]Statement of Facts-Vol. 17 [1992], Docket Entry No. 32-19 at 12.

[174]Answer, Docket Entry No. 88 at 224.

skinheads, including those with whom Tina McDonald associated with, would "hang out" at the Axiom club.[175]  Because some of the flyers referred to dates later than the date specified in the indictment, Davis argues that Foster was actually in those clubs on the dates found on the promotional flyers.  According to Davis, this "provided an opportunity for Tina McDonald and members of her Skinhead group to come into contact with Foster after the time that Davis stated he killed Foster—late Friday night/early Saturday morning . . . ."[176]

This argument merits little serious discussion.  Aside from the one introduced at trial, Respondent contends that the flyers are obviously publicity for upcoming shows.[177]  Eyewitness testimony showed that Davis had left the Pik 'n Pak club with the victim withing the time frame alleged in the indictment.  Even assuming some connection between McDonald and the Axiom club, no evidence places Foster in that club after that date.  And, as discussed with regard to Davis's related Strickland argument, no serious evidence calls into question the timing of his death.  In short, Davis has not shown that the flyers were suppressed or that they would have

---

[175]Petition, Docket Entry No. 30 at 51.

[176]Id. at 51.

[177]Answer, Docket Entry No. 88 at 227.

been material.

## I.   Intellectual Disability (claim 11)

In his eleventh claim, Davis claims that he is a person with intellectual disabilities who should be exempt from execution under Atkins v. Virginia, 122 S. Ct. 2242 (2002). Davis has repeatedly raised Atkins claims over the past two decades. The Court of Criminal Appeals has denied the merits of Davis's Atkins claims three separate times (in his fifth, seventh, and ninth state habeas applications). Davis has not shown that he merits federal habeas relief on this claim.

### 1.   Atkins

Courts considering an Atkins claim employ a "generally accepted, uncontroversial intellectual-disability diagnostic definition," which considers three factors:

> (1) intellectual-functioning deficits (indicated by an IQ score approximately two standard deviations below the mean-i.e., a score of roughly 70—adjusted for the standard error of measurement; (2) adaptive deficits (the inability to learn basic skills and adjust behavior to changing circumstances); and (3) the onset of these deficits while still a minor.

Moore v. Texas, 137 S. Ct. 1039, 1045 (2017); see also Hall v. Florida, 134 S. Ct. 1986, 1993-94 (2014).

The extensive state proceedings addressing Davis's Atkins claims provide a comprehensive record of his intellectual

functioning.  Before reviewing this claim, however, the court notes
two crucial defects in Davis's federal briefing.  First, Davis
makes no effort to address the significant changes in the
evidentiary support for his claim that have transpired since then.
Second, Davis completely fails to argue that he has satisfied the
AEDPA standard on his claim.  Davis's Reply, in fact, does not
address his <u>Atkins</u> claim at all. Davis's failure to brief the AEDPA
standard is an independent and sufficient basis to deny habeas
relief.

2.   <u>State Court Proceedings Before Second Punishment Hearing</u>

Davis first raised an intellectual-disability claim in the
fourth habeas application, which he filed before the Supreme Court
issued the <u>Atkins</u> decision.  The Court of Criminal Appeals denied
that application as an abuse of the writ.[178]  The Supreme Court
subsequently held in <u>Atkins</u> that the execution of persons suffering
from intellectual disability violated the Eighth Amendment.  Davis
renewed an intellectual-disability claim in his fifth habeas
application.[179]  In 2004, the state habeas court held a six-day
evidentiary hearing to resolve the <u>Atkins</u> claim.  The state court

---

[178]Order, <u>Ex parte Davis,</u> No. 40,339-04, Docket Entry No. 34-11 at
3.

[179]Application for Postconviction Writ of Habeas Corpus and Motion
for Stay of Execution, Docket Entry No. 34-24 at 7-32.

had before it three IQ tests that were performed before Davis received a death sentence, only one of which could possibly qualify him for a diagnosis of intellectual disability.[180]  Even then, the parties debated whether that particular test was an adequate and reliable measure of intelligence and whether it could dependably support a diagnosis of intellectual disability.[181]

Davis primarily relied on testimony from a Dr. Gilda Kessner who opined that her testing permitted a diagnosis of intellectual disability.  The State relied heavily on testimony from Dr. George Denkowski whose testing excluded Davis from an intellectual-disability diagnosis.[182]  The state court found that Davis did not qualify for a diagnosis of intellectual disability under any of Atkins's three prongs.[183]  In doing so, the state habeas court relied on Dr. Denkowski's testing and testimony, as well as the Court of Criminal Appeals' interpretation of Atkins in Ex parte Briseno, 135 S.W.3d 1 (Tex. Crim. App. 2004).[184]


3.   Retrial

---

[180]Supplemental Postconviction, Trial Court's Findings of Fact, Conclusions of Law, Docket Entry No. 34-23 at 144-48.

[181]Id. at 147-50.

[182]Id. at 154.

[183]Id. at 177-79.

[184]Id. at 142-43, 163, 175, 177-78.

By the time of Davis's retrial, Texas law allowed a capital defendant to have a jury decide whether he is intellectually disabled.  See Gallo v. State, 238 S.W.3d 757, 769-70 (Tex. Crim. App. 2007).  Davis did not raise any Atkins issue in the retrial of his punishment.[185]  The defense's change in position followed retesting in which Dr. Kessner retracted her opinion about intellectual disability.  Dr. Kessner's new testing found that Davis was "on the cusp of low average to borderline intellectual functioning" but not intellectually disabled.[186]  In other words, Davis's strongest witness from his habeas hearing reassessed her opinion and found that Davis did not suffer from intellectual disability.

The State, nevertheless, presented trial testimony from forensic psychologist Dr. Timothy Proctor showing that Davis had educational deficits, but not intellectual disability.[187]

4.   Seventh State Habeas Application

Davis included an Atkins claim in his seventh state habeas

---

[185]Postconviction Writ, State's Proposed Findings of Fact, Conclusions of Law, and Order, Docket Entry No. 34-55 at 1268.

[186]Ex parte Davis, No. WR-40,339-09, 2020 WL 1557291, at *2.

[187]Reporter's Record-Vol. 27 [2011], Punishment Proceedings, Docket Entry No. 33-34 at 186-94.

application on November 6, 2012.[188]  Davis did not adduce any new evidence or expert testimony to support that Atkins claim.  Davis's seventh habeas application distinguished itself from his earlier Atkins claims by arguing that Texas jurisprudence's reliance on the Briseno factors was unconstitutional.  Davis's Atkins claim faced a serious hurdle: Dr. Kessner, had retracted her diagnosis of intellectual disability.

The state habeas court reviewed the earlier testing and concluded that Davis was not a person "with mental retardation or even borderline intelligence; and, that [Davis] instead has average or, at worst, low average intelligence."[189]  The state habeas court again applied the Briseno factors and found that Davis had not met the second Atkins prong.  The state habeas court ultimately concluded that the Atkins claim in Davis's seventh habeas application was "procedurally barred" because Davis "affirmatively waived the presentation of the issue during his 2011 punishment hearing."[190]  Alternatively, the state habeas court found that Davis had failed to meet all three Atkins prongs and denied the merits.[191]

---

[188]Initial Application for Writ of Habeas Corpus (Filed Pursuant To Tex. Code Crim. Proc. Art. 11.071), Docket Entry No. 34-53 at 155-59.

[189]Id. at 242.

[190]Id. at 254.

[191]Id. at 254-55.

5.   <u>Ninth State Habeas Application</u>

Davis's ninth habeas application also included an <u>Atkins</u> claim.   Davis's ninth application relied on two major changes to Texas cases.   First, in 2017 the Supreme Court denounced the Court of Criminal Appeals' reliance on the <u>Briseno</u> factors when deciding <u>Atkins</u> cases.   <u>See Moore,</u> 137 S. Ct. at 1045; <u>see also In re Milam,</u> 838 F. App'x 796, 798 (5th Cir. 2020) (describing <u>Moore).</u>   Second, Dr. Denkowski's methodology in <u>Atkins</u> cases had been disavowed by the courts.[192]   Davis's briefing discussed both changes, but did not include any new evidence or present new psychological findings. Davis, however, ignored the adjudication from his seventh habeas application and did not address Dr. Kessner's retraction of her intellectual-disability diagnosis.

The Court of Criminal Appeals remanded the case to the lower court to determine whether Davis could proceed in a successive habeas application raising an <u>Atkins</u> claim and, if so, whether it merited habeas relief.   The state district court recommended that the Court of Criminal Appeals dismiss the <u>Atkins</u> claim as abuse of the writ under Article 11.071, § 5.[193]   The Court of Criminal

---

[192]<u>See Butler v. Stephens,</u> 625 F. App'x 641, 644-45 (5th Cir. 2015); <u>Maldonado v. Thaler,</u> 625 F.3d 229, 234-35 (5th Cir. 2010); <u>Pierce v. Thaler,</u> 604 F.3d 197, 214-16 (5th Cir. 2010).

[193]Supplemental Postconviction, State's Proposed Findings of Fact and Conclusions of Law, Docket Entry No. 34-56 at  at 253-56.   The lower habeas court recommended the dismissal of Davis's <u>Atkins</u> claim on procedural grounds.   Because the lower court did not
(continued...)

Appeals ultimately "reviewed all the evidence in the writ record, [Davis's] filings, and the relevant portions of the direct appeal record," and found that Davis did not make "an adequate prima facie showing regarding the claim of intellectual disability."[194]   In its role as the ultimate fact finder, the Court of Criminal Appeals dismissed the <u>Atkins</u> claim as an abuse of the writ, a decision which qualifies for AEDPA deference in the <u>Atkins</u> context.   <u>See</u> <u>Busby,</u> 925 F.3d at 707-10.

> 6.   <u>The Atkins Claim in Davis's Federal Petition</u>

After raising <u>Atkins</u> claims in various state habeas applications, Davis now seeks federal habeas relief.   Davis's federal petition largely grounds his most-recent <u>Atkins</u> claim in the testimony, evidence, and psychological opinions from the evidentiary hearing held by the state courts during his fifth habeas action.   Davis bases his federal <u>Atkins</u> claim on:

> (1)   criticism of the standards formerly used by Texas courts that have since been repudiated;

---

(...continued)
consider the most-recent Supreme Court precedent, however, the Court of Criminal Appeals considered the issue in its role as the ultimate fact finder.

[194]<u>Ex parte Davis,</u> No. WR-40,339-09, 2020 WL 1557291, at *3 (Tex. Crim. App. Apr. 1, 2020).   In a departure from traditional procedural default jurisprudence, the Fifth Circuit will consider the state court's finding that the inmate made an inadequate prima facie showing of intellectual disability as a merits-based adjudication. <u>See Busby v. Davis,</u> 925 F.3d 699, 707-10 (5th Cir. 2019).

    (2)   criticism of the methodology and testimony of the State's expert, Dr. Denkowski;

    (3)   assessment of record evidence and testing performed by Dr. Kessner;

    (4)   a review of the evidence presented during the 2004 hearing and considered by the state courts in rejecting his <u>Atkins</u> claim; and

    (5)   an opinion from an educational psychologist, Dr. Denis W. Keyes, who did not perform any testing but opined in 2002 that "strong evidence" existed that Davis was intellectually disabled.

Because Davis's federal petition copies the language from his ninth state habeas application nearly word-for-word, he briefs the state standard to allow successive habeas review and argues that "[t]he evidence . . . raises a prima facie case that Mr. Davis is intellectually disabled . . . ."[195]

Davis presents his claim as if nothing transpired after the Court of Criminal Appeals denied the <u>Atkins</u> claim in his fifth habeas application.  But much has happened to weaken Davis's Atkins claim since then.  Davis no longer serves the same sentence he challenged in that proceeding.  Davis's main expert, Dr. Kessner, no longer opines that he is intellectually disabled.  Davis does not discuss his counsel's choice not to raise intellectual disability in the 2011 retrial.  Davis's briefing ignores the more-recent state decisions which address the death sentence he now

---

[195]<u>Compare id.</u> at 149-175 <u>with</u> Subsequent Application for Writ of Habeas Corpus Filed Pursuant to Article 11.071, Section 5; Exhibits, Docket Entry No. 34-80 at 84-120.

serves.

Davis's arguments that the state courts may have relied on improper standards or discredited testimony at some point cannot carry the day.  It is true that much has transpired in <u>Atkins</u> jurisprudence since the state courts held an evidentiary hearing on his intellectual-disability claim in 2004.  Since the time, the Supreme Court has rejected the Court of Criminal Appeals' <u>Briseno</u> standards.  <u>See Moore,</u> 137 S. Ct. at 1048-53.  Testimony from the State's former expert Dr. Denkowski, a frequent expert in <u>Atkins</u> cases, has been discredited.  But Davis's petition fails to meet his affirmative burden to prove that he suffers from intellectual disability.  Davis does not present any psychological evidence that credibly shows that he suffers from an IQ which qualifies him for a diagnosis of intellectual disability.  Davis's petition, in fact, lacks candor because he does not discuss Dr. Kessner's disavowal of her prior diagnosis.

In the end, Davis bears the burden of proving his <u>Atkins</u> claim.  Davis does not meet his burden, but he instead fails to be forthright about the evidence.  Davis falls far short of showing that the state courts acted contrary to Supreme Court law or unreasonably in repeatedly denying his <u>Atkins</u> claim.  The court will deny this claim.

**J.   Ineffective Assistance of Counsel (claims 12 and 18)**

-87-

Davis's petition alleges numerous deficiencies in the representation provided by his trial attorneys.  In his twelfth claim, Davis alleges that his attorneys in the 1991 trial and his 2011 penalty-only retrial provided ineffective assistance by failing to:

- interview and present eyewitnesses to the crime during his trial in 1992 (claim 12(b),(c));

- present a false confession expert during retrial of punishment in 2011 (claim 12(d));

- present DNA evidence during retrial that Tina McDonald could not be excluded as the source of a hair found on Foster's shirt (claim 12(e));

- present evidence during retrial regarding Tina McDonald's violent and aggressive character (claim 12(f));

- question Margie Kessler during retrial about calls she received from Davis just before, and after, he confessed (claim 12(g));

- effectively present evidence to rebut the State's case for future dangerousness (claim 12(h));

- present foundational mitigation evidence during retrial from lay witnesses (claim 12(i));

- call a social historian to testify regarding Davis's life history (claim 12(j));

- object during retrial to the admission of the mask as a whole (claim 12(k));

- present expert testimony during retrial regarding the DNA on the stocking (claim 12(l)); and

- retrial and on state habeas to effectively investigate and present Davis's Eighth Amendment intellectual disability claim (claim 12(m)).

In claim eighteen, Davis also argues that his 2011 attorneys were ineffective for failing to preserve certain issues for appellate review.

A reviewing court assesses counsel's representation under the standards established in Strickland v. Washington, 104 S. Ct. 2052 (1984). To prevail under the Strickland standard, a criminal defendant must demonstrate (1) that his counsel's performance was deficient and (2) that the deficient performance resulted in prejudice. Id. at 2064. To satisfy the deficient-performance prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. This is a "highly deferential" inquiry that requires "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 2065. To satisfy the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 2068. A habeas petitioner must "affirmatively prove prejudice." Id. at 2067.

With the exception of sub-claim 12(m), Davis exhausted his Strickland arguments in state court. A federal court's review of the state court's application of Strickland is "doubly deferential." Knowles v. Mirzayance, 129 S. Ct. 1411, 1413 (2009). Under that review, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. Richter,

-89-

131 S. Ct. at 785. Davis, therefore, must overcome the doubly deferential AEDPA standard before federal relief is available for most of his <u>Strickland</u> arguments.  Davis's briefing, however, largely copies the arguments he presented in his state litigation without making any attempt to shoulder his AEDPA burden.  Davis's failure to brief, much less meet, his AEDPA burden is an independent and sufficient reason to deny this claim.  The court, nevertheless, will briefly review each of his <u>Strickland</u> arguments.

       1.   <u>Failing to Interview and Present Witnesses to the Crime (claim 12(b),(c))</u>

Davis complains that his 1992 trial counsel did not interview witnesses—which he terms "eyewitnesses to the crime"—before trial.[196]  None of the alleged "eyewitnesses" actually saw the crime. Instead, Davis faults trial counsel for not exploring the possibility of calling witnesses who allegedly could establish a different time line for Foster's death.

The State indicted Davis for killing Foster on or about Saturday, August 10, 1991.  Davis alleges that the defense should have called four witnesses who could have challenged the State's version of events:

       •    Donna Motilal "told police when interviewed in 1991 that she saw Foster

---

[196]Petition, Docket Entry No. 30 at 179-84.

in Houston alive Saturday August 10, 1991
or Sunday August 11, 1991 at the gas
station where she worked."

- Kerry Day told police in 1991 that "he
  saw Foster alive Saturday night August
  10, 1991 at Rudyard's Pub in Houston
  around 9 or 10 p.m."

- Jeanne Luckey, Foster's upstairs
  neighbor, "heard a disturbance and doors
  slamming in Foster's apartment late
  Monday night on August 12, 1991." [197]

- Sheryl Theis "whose apartment shared a
  common wall with Foster's apartment" said
  that on "August 13, 1991 . . . she heard
  a thump coming from the common wall her
  apartment shared with Michael Foster's
  apartment . . . ." [198]

Davis hopes that those witnesses would have allowed the
defense to argue that he could not have killed Foster on the night
alleged in the indictment. Davis bases this claim on the argument
that he unwaveringly maintained in his confession that he committed
the crime on Friday night. Davis says that he "insisted in his
confession that he and Tina McDonald took Foster home on Friday
night, and Davis murdered Foster early Saturday morning." [199]

In reality, Davis could not positively remember which night he

_____

[197] Luckey also conveyed hearsay statements that another neighbor had
seen Foster alive, but Davis has not presented any affidavit from
that other person or shown how that statement would have been
admissible.

[198] Petition, Docket Entry No. 30 at 182.

[199] Id. at 107.

-91-

committed the murder.[200]   Davis said he "didn't know the date this took place" but "[i]t was either Friday or Saturday."[201]   Davis leaned toward believing it was Friday night based on which band he saw perform, but still asked if he could pause the interview to call a friend and verify which night he had visited the Pik' N Pak club.[202]

The State argued that Davis committed the murder *on or about* Saturday August 10.  Any potential testimony from Motilal and Day would not be helpful to the defense because it would still allow for Foster's death to have occurred within the time specified by the indictment.  As to the other two witnesses, neither said they saw Foster alive after Saturday night.  Davis says that their testimony could have shown that Foster "was having a party or some gathering of people Monday night before his body was found Tuesday," but he misconstrues their statements.[203]  Those witnesses say that they heard noise possibly coming from Foster's apartment, which does not mean he was hosting a social gathering after the date in the indictment.

---

[200]Davis gave the police the wrong name for the club where he met Foster.  Reporter's Record [1992], Docket Entry No. 32-21 at 170, 173.  He later clarified that it was the Pik' N Pak.  Id. at 186.

[201]Id. at 170, 174.

[202]Id. at 193.

[203]Id. at 35.

The convincing evidence of Davis's guilt contrasts sharply with the inconclusive information provided by the four uncalled witnesses.  See Thornell v. Jones, 144 S. Ct. 1302, 1310 (2024) (holding that a court must weigh the evidence supporting an inmate's Strickland arguments against all the evidence, including that unfavorable to the inmate's claim).  The evidence of Davis's guilt was strong, particularly because he gave a videotaped confession in which he accurately recounted details about the murder.  In light of that information, and considering the marginal use for the testimony he has adduced, Davis has not shown that a reasonable attorney would have called those witnesses to challenge his guilt.  And Davis does not prove that their testimony would have resulted in a reasonable probability of a different result. The court denies claim 12(b)/(c).

### 2.    Failing to Call a False-Confession Expert at the 2011 Punishment Hearing (claim 12(d))

In claim 12(d), Davis faults the attorneys in his 2011 retrial for not calling an expert witness to testify about the phenomenon of false confessions.[204]   Davis supports this claim with an affidavit from an expert witness, Dr. Gregory DeClue.  According to Davis, Dr. DeClue "would have presented evidence to the jury that a confession that may be ruled legally 'voluntary,' and therefore

_____

[204]Petition, Docket Entry No. 30 at 184-204.

-93-

admissible into evidence" but still "not conclusively establish actual guilt."[205]   Davis claims that trial counsel should have relied on an expert such as Dr. DeClue to point out factors which would call into question Davis's confession.

Davis's attorneys in 2011 approached his confession against the backdrop of his earlier attorneys' efforts.  The attorneys who represented Davis in 1992 strongly challenged his confession, both in a suppression hearing and at trial.  The 1992 trial court had considered a pre-trial suppression motion and found that Davis voluntarily and knowingly confessed to the murder.  The jury considered Davis's evidence at trial and, notwithstanding, found his confession credible. The Court of Criminal Appeals had reviewed various challenges to Davis's confession and found no constitutional error.

Even though the trial judge at retrial "was very clear that she would not allow any attempt to re-litigate [Davis's] guilt," trial counsel decided to investigate whether they could raise a viable challenge to Davis's confession.[206]  Trial counsel hired Dr. Solomon Fulero, an expert in false-confession phenomena.[207]   Trial

---

[205]Id. at 189.

[206]Id. at 265.

[207]Dr. Fulero, who holds both a Ph.D. in psychology and a juris doctorate degree, see Moore v. Tate, 1988 WL 101273, at *8 (S.D. Ohio 1988), is a nationally known expert in false confession whose "'qualifications and scientific methods'" in particular have "been
(continued...)

counsel "met with [Dr. Fulero] in Houston prior to trial, and . . . . discussed all of his thoughts as to this case."[208]  Trial counsel provided several reasons they nonetheless decided not to call Dr. Fulero as a witness: they thought it was clear from the evidence that Davis only confessed to protect his wife, they wanted to convince jurors that Davis had been at the crime scene but was not the murderer, in rebuttal the prosecution would emphasize elements of Davis's confession that only the killer would know, and they thought his testimony would undermine other parts of their defense.[209]  Mr. Cornelius opined: "I was absolutely certain this would not be helpful and would, in all likelihood, alienate the jury."  In essence, trial counsel feared that calling a false confession expert would only backfire and end in "reinforcement of the State's case."[210]

A reviewing court "will not question a counsel's reasonable strategic decisions." Bower v. Quarterman, 497 F.3d 459, 470 (5th Cir. 2007).  The trial court found the defense attorneys'

---

(...continued)
'praised' by the Sixth Circuit." United States v. Moonda, 2007 WL 1875861, at *1 (N.D. Ohio 2007) (quoting United States v. Langan, 263 F.3d 613, 623 (6th Cir. 2001) and United States v. Smithers, 212 F.3d 306, 315 (6th Cir. 2000)).

[208]Postconviction Writ, Affidavit of Allen Tanner, Docket Entry No. 34-57 at 261.

[209]Id. at 261-63.

[210]Postconviction Writ, Affidavit of R. P. Cornelius, Docket Entry No. 34-57 at 266.

affidavits to be credible and recognized their strategic decisions.[211]  With that background, the state habeas court found that "trial counsel made a reasonable, plausible trial decision not to present the testimony of a false confession expert."[212]  Davis's extensive briefing does not show that the state court was unreasonable and, in fact, fails to analyze the tactical reasons trial counsel gave for not calling the expert they selected.  The court finds that the state habeas court's denial of this argument was not contrary to, or an unreasonable application of, federal law.  <u>See</u> 28 U.S.C. § 2254(d)(1).

3.   <u>Present DNA Evidence that McDonald Could Not Be Excluded as the Source of a Hair Found on the Victim's Shirt (claim 12(e))</u>

In claim 12(e), Davis argues that his 2011 attorneys should have presented DNA evidence that connected McDonald to the crime.[213] In the 2011 penalty retrial, the defense called John Moran, a former DPS forensic scientist, to testify that a hair from the victim's shirt exhibited characteristics consistent with McDonald's hair.  Moran testified on cross-examination that he could not exclude McDonald from being the contributor to the hair on the

------

[211]Postconviction Writ, Findings of Fact and Conclusions of Law, and Order, Docket Entry No. 34-57 at 216-21.

[212]<u>Id.</u> at 21.

[213]Petition, Docket Entry No. 30 at 204-08.

victim's shirt.  Davis now argues that trial counsel should have done more to tie McDonald to the hair.  In essence, Davis argues that trial counsel should have used the DNA to support a defense showing "that it was reasonably probable McDonald was an active participant in the events that took place in Foster's apartment."[214]

When Davis presented this claim in his seventh habeas application the state court found that trial counsel was not ineffective for failing to present evidence about the hair "more conclusively."[215]  Respondent accurately summarizes the weakness of this claim: "At its crux, Davis is arguing that trial counsel were ineffective for not more conclusively proving a point that was already proved at trial—namely that Tina McDonald was at the scene of the offense and her hair could have been recovered from the scene."[216]

Reviewing courts are "particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough . . . evidence? Those questions are even less susceptible to judicial second-guessing." Carty v. Thaler, 583 F.3d 244, 258 (5th Cir. 2009). This is particularly the case where McDonald's presence at the

---

[214]Id. at 208.

[215]Postconviction Writ, Findings of Fact and Conclusions of Law, and Order, Docket Entry No. 34-57 at 250.

[216]Answer, Docket Entry No. 90 at 282-83.

scene was not in dispute by the parties.  Further confirmation of the hair as belonging to McDonald would do little to increase her culpability or decrease Davis's, especially in the context of a sentencing hearing in which the jurors' primary consideration was his sentence, not his guilt.  Accordingly, the court finds that Davis has not met his burden under the <u>Strickland</u> standard, much less AEDPA's deferential review of the state court's rejection of this claim.

### 4.   Failing to Present Evidence Regarding Tina McDonald's Violent and Aggressive Character  (claim 12(f))

In claim 12(f),[217] Davis claims that 2011 trial counsel should have shifted blame for the murder to McDonald by "presenting evidence of [her] aggressive, manipulative, and violent character."[218]  Davis identifies four individuals (Brian Courtney, Bryan Falconer, Calvin Doby, and Matt Marquis) who he claims trial counsel should have called to testify about McDonald's violent, controlling, and manipulative character.[219]  Davis uses their affidavit testimony to show that McDonald was the "'leader' in their relationship" and to raise questions about whether Davis only

---

[217]<u>Id.</u> at 208-14.

[218]<u>Id.</u> at 209.

[219]<u>Id.</u> at 210-13.

confessed to protect her.[220]

When Davis raised this claim in his seventh state habeas application, both trial attorneys explained why the defense did not explore McDonald's bad character. "How to handle Tina McDonald in general was a great debate between" his attorneys and Davis.[221] Trial counsel seriously considered both the risks and benefits of developing a defense based on McDonald's violent character. Trial counsel interviewed people who could testify about McDonald, but feared that presenting their testimony would backfire against the defense. As found by the state habeas court, "counsel was put on notice that Tina McDonald 'would bury' [Davis] . . . with information about criminal acts if she were attacked" so "trial counsel decided to leave Tina McDonald out of it."[222]

On that basis, the state habeas court found that "trial counsel made a reasonable, plausible trial decision not to attack McDonald . . . ."[223]   Courts generally defer to such tactical decisions.  See Pape v. Thaler, 645 F.3d 281, 292 (5th Cir. 2011) ("[W]e continue to extend highly deferential treatment to counsel's sentencing strategy and tactical decisions.").  The state habeas

---

[220]Id. at 209.

[221]Postconviction Writ, Affidavit of Allen Tanner, Docket Entry No. 34-57 at 261.

[222]Id. at 224.

[223]Postconviction Writ, Findings of Fact, Conclusions of Law, and Order, Docket Entry No. 34-57 at 224.

court also found no <u>Strickland</u> prejudice, particularly when
weighing from evidence McDonald's violent character against both
the evidence which would come in with it and the other evidence
from trial.[224] The state court's assessment of both <u>Strickland</u>
prongs was not unreasonable.   Under both AEDPA and after the
court's independent review, the court finds that Davis has not met
the high standards for federal habeas relief.


     5.   <u>Failing to Question Margie Kessler about Calls She
Received from Davis Before and After He Confessed (claim
12(g))</u>

Davis faults his 2011 trial attorneys for not questioning his
aunt, Margie Kessler, about a phone call she received from Davis
before he confessed.[225]   Kessler testified during the 2011
punishment hearing about Davis's good behavior and character.   In
a habeas affidavit, Kessler explained that Davis called her after
his arrest and told her that, even though "the night it happened he
was really drunk in a motel somewhere," he was "gonna take the
blame for [McDonald] because she has a child."[226]  Davis argues that
trial counsel should have questioned Kessler about the phone call
because "[s]uch evidence would have called into question the extent

_____

[224]<u>Id.</u>

[225]Petition, Docket Entry No. 30 at 215-18.

[226]Postconviction Writ, Affidavit of Margie Kessler, Docket Entry
No. 34-54 at 175.

of Davis's involvement in the crime he was charged with, thus reducing his culpability in the minds of the jurors."[227]

Trial counsel Tanner explained why the defense did not ask Kessler about the phone calls: "without the Defendant testifying the statements would be hearsay and self serving and the judge would have excluded them."[228]   The state habeas court agreed that any testimony from Kessler about Davis's statements would have been excluded as hearsay.[229]   The state habeas court provided two other reasons that counsel's performance was not deficient: (1) details in Davis's confession and other trial evidence contradicted Kessler's testimony[230] and (2) Kessler's testimony would open the door to the admission of a letter Davis wrote to McDonald in which he "tried to manipulate her to take the blame so he could file a new writ and get a retrial."[231]   Based on those factors, the state habeas court found that "trial counsel made the reasonable, plausible trial decision not to attempt to present through Kessler's testimony statements [Davis] allegedly made to

---

[227]Petition, Docket Entry No. 30 at 215.

[228]Postconviction Writ, Affidavit of Allen Tanner, Docket Entry No. 34-57 at 263.

[229]Postconviction Writ, Findings of Fact, Conclusions of Law, and Order, Docket Entry No. 34-57 at 225.

[230]Id.

[231]Id.

Kessler."[232]

Davis makes no effort to show that the state habeas court's decision was unreasonable. Trial counsel made a strategic decision not to call Kessler. The law honors that decision. This court's review confirms that the state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law. See 28 U.S.C. § 2254(d)(1).

### 6. Ineffectively Presenting Mitigation Evidence to Rebut the State's Evidence that Davis Would be a Future Danger (claim 12(h))

In his 2011 retrial, the State argued that Davis "would be a future danger based on his past disciplinary record in prison and his association with the Aryan Brotherhood."[233] In Claim 12(h), Davis faults trial counsel for not presenting evidence that would place his prison infractions into context. Davis alleges that trial counsel should have shown that difficulty adjusting to a high-security prison environment caused him to act irrationally when on death row after his first trial. Davis proposes that trial counsel should have called exonerated former death row inmates to describe the circumstances of prison life.

When Davis raised this claim in his seventh state habeas

---

[232]Id.

[233]Petition, Docket Entry No. 30 at 218.

application, the state habeas court found that Davis's proposed testimony would require the jury to find out that he had previously received a death sentence.[234]  Trial counsel, however, "didn't want to take a chance on the jury finding out about Mr. Davis being on death row" during the 2011 punishment hearing.[235]  The state habeas court endorsed that strategy and further noted that the jury would "likely not be[] sympathetic to death row conditions being restrictive and 'grim.'"[236]

Davis has not made any effort to show that the state habeas court's decision was unreasonable.  Trial counsel presented extensive evidence in the penalty phase.  Davis proposes a strategy which runs directly contrary to the defense's efforts to avoid any discussion about his earlier death sentence.  The state habeas court was not unreasonable for endorsing trial counsel's strategic decision to avoid harmful information.  Davis does not merit relief under AEDPA's deferential standard.

### 7. Failing to Present Foundational Mitigation Evidence and Not Calling a Social Historian (claims 12(i),(j))

In claim 12(i), Davis faults trial counsel for not presenting

---

[234]Id. at 226.

[235]Affidavit of Allen Tanner, Docket Entry No. 34-57 at 262.

[236]Findings of Fact, Conclusions of Law, and Order, Docket Entry No. 34-57 at 227.

-103-

"foundational mitigating evidence."[237]   Davis identifies "seven additional lay witnesses" which "[p]ost-conviction investigation has uncovered" which "trial counsel should have called to testify."[238]   Additionally, Davis says that trial counsel should have asked additional questions of the mitigation witnesses who did testify at retrial.   In claim 12(j), Davis argues that trial counsel then should have called a social historian who could "weave the bare facts of [his] life into a compelling narrative" and particularly give jurors a "comprehensive account of [his] life."[239]

The state habeas court extensively reviewed the evidence Davis presented on state habeas review and compared it to the evidence trial counsel presented.[240]  The state habeas court found that trial counsel "effectively presented essentially the same mitigation evidence through thirty mitigation witnesses."[241]  To the extent that Davis's habeas testimony differed, the state habeas court found that (1) evidence that other family members' histories, including their drinking problems, was "unpersuasive" because "there is no evidence that [Davis] was affected by these distant

---

[237]Petition, Docket Entry No. 30 at 233-83.

[238]Id. at 234-35.

[239]Id. at 236.

[240]Id. at 227-34.

[241]Postconviction Writ, Findings of Fact, Conclusions of Law, and Order, Docket Entry No. 34-57 at 252.

occurrences"; (2) testimony that Davis "was not capable of murder" was "speculative and unpersuasive" because of the "guilty verdict" and his other crimes; (3) evidence of his drug use was "likely . . . more harmful that beneficial"; and (4) any testimony about his father's bad acts was "irrelevant and unpersuasive . . . in light of trial counsel· presenting extensive, relevant information concerning his father's behavior toward [Davis]."[242]  Finally, the state habeas court endorsed trial counsel's decision not to call a social historian when the defense had already presented the same basic information from other sources.[243]

A review of the new evidence confirms that "[t]his is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face . . . ." Bobby v. Van Hook, 130 S. Ct. 13, 19 (2009).  Trial counsel made reasonable strategic decisions about how to present a mitigation case, including the choice not to call a social historian.  Much of the additional mitigation evidence presented by Davis "was largely cumulative and differed from the evidence presented at trial only in detail, not in mitigation thrust." Villegas v. Quarterman, 274 F. App'x 378, 384 (5th Cir. 2008).  The decision trial counsel made to put the evidence before the jurors through numerous witnesses rather than through an expert social

---

[242]Id. at 233-34.

[243]Id. at 234.

historian is a tactical one to which courts defer.  See Yarborough
v. Gentry, 124 S. Ct. 1, 4 (2003) ("[C]ounsel has wide latitude in
deciding how best to represent a client.")(quotation omitted).

To the extent the habeas evidence differs from that presented
at trial, the state habeas court provided reasons for which a
reasonable attorney would not use that information and found no
reasonable probability of a different result had counsel done so.
The state court decision was not contrary to, or an unreasonable
application of, federal law.  See 28 U.S.C. § 2254(d)(1).


    8.  Failing to Object to Testimony Regarding a Mask (claim
        12(k))

At the 2011 penalty-only retrial, Thomas Cason testified that
he cut off the leg of his grandmother's pantyhose and gave it to
Davis before he robbed the Beverage Barn in Mineral Wells.  The
police found a cut-off piece of pantyhose next to Keith Blaylock's
body in his abandoned truck.  At trial, the parties used various
names to describe the cut-up pantyhose found near Foster's body,
including  "a stocking, a hose, a stocking mask, a stocking cap,
and pantyhose."[244]  Davis's claim 12(k) faults trial counsel for not
objecting to using the term "mask."[245]  Davis also faults counsel

—————————————————

[244]Id. at 237 (providing record citations).

[245]Petition, Docket Entry No. 30 at 283-90.

-106-

for not objecting to the introduction of the "mask" into evidence because of concerns about the chain of custody.

Davis argues that "there was no indication of what [the stocking] might have been used for" so counsel should have objected to its characterization as a "mask."[246]  The state habeas court, however, found that "testimony was elicited that a police officer recognized, in 1988, that a woman's hose or stocking was generally used to pull over a person's head to distort features."[247]  With that understanding, the state habeas court found that "trial counsel are not ineffective for not objecting to the term 'stocking mask.'"[248]

Davis also says that trial counsel should have raised an objection to the chain of custody.  The state habeas court reviewed the State's possession of the stocking and found "[b]ased on the established chain of custody" that Davis "fail[ed] to show that trial counsel are ineffective for not objecting to the admission of the stocking mask . . . ."[249]  The state habeas court also cited state law which holds that "any problem in chain of custody goes to

_____

[246]Id. at 285.

[247]Postconviction writ, Findings of Fact, Conclusions of Law, and Order, Docket Entry No. 34-57 at 253.

[248]Id. at 237.

[249]Id.

weight, not admissibility, of evidence."[250]

Davis makes no effort to meet his AEDPA burden on this issue. Trial testimony allowed for the term "mask," a word whose use alone would make little difference in trial. The state habeas court found that the stocking was admissible; questions about the admissibility of evidence are questions of state law. Davis's briefing falls far short of proving ineffective assistance which would have prejudiced the defense. The court will deny this claim.

9.   **Failing to present expert testimony during retrial regarding the DNA on the stocking (claim 12(l))**

Before the 2011 retrial, the State had DNA testing performed on the stocking by Orchid Cellmark. The State presented testimony at trial that "there were at least one male and one female in the DNA mixture obtained from testing the Stocking—results consistent with a female wearing the stocking before a male contributed to the mixture."[251]

Trial counsel sought out the assistance of an expert, Huma Nasir, a Forensics Supervisor from Orchid Cellmark. Nasir's testing, however, did not exclude Davis from being a contributor to

---

[250]Id. at 253 (citing Druery v. State, 225 S.W.3d 491, 503 (Tex. Crim. App. 2007); see also Shields v. Dretke, 122 F. App'x 133, 149-50 (5th Cir. 2005) ("A break in the chain of custody simply goes to the weight of the evidence, not its admissibility.") (quotation omitted).

[251]Id. at 237.

the DNA on the stocking.   Trial counsel did not use Nasir as a witness.   In his seventh state habeas application, Davis presented an affidavit from Nasir explaining that she would have testified to different statistics concerning the DNA. Specifically, Nasir "discovered *one in* 261 random Caucasians could be contributors" which would mean that there were "45,785 possible matches in Texas."[252] Davis contends that trial counsel provided ineffective assistance by not calling Nasir as a witness.

Trial counsel Tanner testified in his habeas affidavit that the defense "didn't believe that calling a DNA expert to the stand would benefit [the defense] following the cross examination of the state[']s DNA expert," particularly because the defense's "DNA expert[']s opinion did not exclude Mr. Davis."[253]   After extensively reviewing the factual basis for this claim,[254] the state habeas court found that Davis "concede[d] that both the DPS Lab and Orchid Cellmark reached the same result of not being able to exclude [Davis] as a contributor to the DNA profile on the stocking."[255] Even through the trial testimony about statistical probability

---

[252]Petition, Docket Entry No. 30 at 295.

[253]Postconviction Writ, Affidavit of Allen Tanner, Docket Entry No. 34-57 at 262.

[254]Postconviction Writ, Findings of Fact, Conclusions of Law, and Order, Docket Entry No. 34-57 at 237-39.

[255]Id. at 239.

differed from that in Davis's habeas evidence, the State's trial expert "did not testify or imply that it was statistically impossible from someone other than [Davis] to be the contributor to the DNA on the stocking."[256]  The state habeas found that "trial counsel made the reasonable, plausible trial decision to extensively cross-examine [the State's expert] about the DNA testing rather than present the testimony of Huma Nasir from Orchid Cellmark who would have agreed with [the] conclusion that [Davis] could not be excluded as a contributor to the DNA profile—regardless of their statistical analyses differing."[257]

Trial counsel made a strategic decision not to challenge the DNA evidence through another expert.  Davis now may disagree with that decision, but the law still gives great deference to trial counsel's tactical decisions.  And Davis makes no effort to show that the state habeas court was unreasonable in finding no deficient performance.  Further, because Davis's habeas evidence did not exclude him as a contributor to the DNA mixture, he has not shown that the state habeas court's decision regarding prejudice was unreasonable.  Davis completely fails to meet his AEDPA burden with respect to this claim.  The court will deny this claim.

---

[256]Id.

[257]Id.

10. Ineffectively Investigating and Presenting Evidence of Intellectual Disability (claim 12(m))

In Claim 12(m), Davis alleges that "[t]rial and writ counsel performed deficiently by not properly investigating the facts and presenting evidence of" intellectual disability.[258] Davis did not raise this claim in state court. Davis recognizes the procedural bar which results from his failure to exhaust this claim. Davis, however, provides a conclusory argument that Martinez v. Ryan, 132 S. Ct. 1309 (2012), allows for de novo federal review.[259]

Under Martinez, the ineffective assistance of a state habeas attorney may forgive an inmate's failure to exhaust a Strickland claim. But Davis has not adequately briefed his Martinez argument. Davis makes conclusory statements about his prior habeas attorneys' decision not to raise a Strickland claim based on Atkins, but makes little effort to show ineffectiveness or resultant prejudice. Davis's prior attorneys have exhaustively litigated substantive Atkins claims, both before and after his 2011 retrial. Trial counsel decided not to raise an Atkins issue at his 2011 retrial because Davis's earlier expert disavowed her diagnosis of intellectual disability. The state habeas courts twice considered habeas challenges based on Atkins after the second death sentence.

---

[258]Petition, Docket Entry No. 30 at 301.

[259]Id. at 303.

No reviewing court has found that Davis meets any of the elements necessary to merit relief under <u>Atkins.</u>  With that context, Davis completely fails to make any effort to show a reasonable probability that habeas relief could have been granted if counsel had raised the omitted claim.  <u>See Soliz v. Davis,</u> 750 F. App'x 282, 290 (5th Cir. 2018); <u>Mamou v. Davis,</u> 742 F. App'x 820, 828 (5th Cir. 2018).  Claim 12(m) is not available for federal review.

Alternatively, trial counsel made an informed, strategic decision not to raise <u>Atkins</u> arguments.  Given the strong evidence that Davis is not intellectually disabled, Davis has not shown that prejudice flows from that decision.  The court would deny this claim if the merits were fully available for federal review.  <u>See</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

11.  <u>Failing to Preserve the Record for Appeal (Claim 18)</u>

In his eighteenth ground for relief, Davis complains that trial counsel "failed to preserve the record for appeal by acquiescing to a multitude of off-the-record conferences" in 2011

punishment hearing.[260]   According to Davis's count, "forty-one discussions were held off the record during voir dire, pre-trial proceedings, and the punishment phase itself."[261]   Conceding that establishing prejudice is difficult in light of the silent record, Davis alleges harm in that courts lacked a sufficient basis to review his punishment retrial.

Davis raised this claim in his seventh state habeas application.   There, the state habeas court disputed Davis's assertion that all bench conferences were not recorded, pointing to one example where the "record includes a complete, record discussion" where Davis had alleged it was unrecorded.[262] In fact, the state habeas court found that the "record contains numerous bench conferences and proceedings conducted out of the presence of the jury that were recorded . . . ."[263]   The thrust of the state habeas court's decision, however, found that Davis "presents only conclusions and speculations regarding potential harm, if any, from any unrecorded conferences and does not show that his appellate record is missing 'substantial and crucial' portions so that his

---

[260]Petition, Docket Entry No. 30 at 333.

[261]Id. at 336.

[262]Postconviction writ, Findings of Fact, Conclusions of Law, and Order, Docket Entry No. 34-57 at 246.

[263]Id. 245.

-113-

right to appeal is illusory."[264]  On that basis, the state habeas court found that Davis had not shown either <u>Strickland</u> deficient performance or prejudice.[265]

Davis does not attempt to meet his burden under AEDPA. Davis's petition merely copies the language from his ninth state habeas application without addressing the state court's decision. Davis's unsupported statements about prejudice compound the inadequacy of his briefing.  Davis does not discuss what information may not have been preserved on the record or show what errors he could not present on appeal.  Davis's conclusory claim fails to provide a meritorious basis for federal habeas relief. The court will deny this claim.

### K.    The Protest Letter (claims 13, 14, and 15)

Davis raises three claims that all relate to a letter which Humble Police Department Detective Charles Smith wrote to the Texas Board of Pardons and Paroles.  In a letter dated January 6, 2004, Detective Smith "protest[ed] . . . any consideration for Parole for inmate Tina Louise McDonald."[266]  Davis raises three constitutional claims based on what he labels the "protest letter."  In claim

––––––––––––––––––––––––

[264]<u>Id.</u>

[265]<u>Id.</u> at 257.

[266]Letter dated January 6, 2004, Docket Entry No. 40-2 at 74.

-114-

thirteen, Davis argues that the letter proves the State presented false testimony about his confession in his 1992 trial regarding "whether [he] was promised McDonald would receive immunity prior to his confession."[267]   Davis's fourteenth claim relies on the same factual basis to argue that the State presented false evidence in his 2011 penalty-only retrial.   Finally, in claim fifteen Davis claims that the State violated <u>Brady</u> by not turning over the protest letter before his 2011 retrial.

These claims are procedurally barred and, alternatively, without merit.

### 1.   Procedural Bar

Davis raised these three claims in his eighth state habeas application which the Court of Criminal Appeals dismissed as an abuse of the writ.   Davis makes no effort in either his Petition or his Reply to overcome the procedural bar.   The court, nevertheless, will briefly review the claims in the alternative.

### 2.   The Protest Letter

Davis's three claims based on the protest letter hope to prove that he confessed pursuant to an agreement.   The question of whether the State made a promise arose early in the case.   The State has maintained since Davis's first trial that no promise was

_____

[267]Petition, Docket Entry No. 30 at 305.

made to secure his confession.   In the pre-trial suppression hearing

> [b]oth Davis  and the assistant district attorney
> testified . . . that the assistant district attorney
> stated that no agreements were made prior to the
> confession.   Nevertheless, [Davis] testified that while
> the assistant district attorney stated he would not give
> [McDonald] immunity, [Davis] believed that was not what
> the assistant district attorney meant.   [Davis] also
> stated that he believed if he confessed, he would receive
> only a life sentence.[268]

The trial court entered written findings and conclusions deciding that no deal for immunity had been made.[269]

The question of whether Davis testified pursuant to a promise was a repeated theme throughout trial.   When Davis challenged his conviction on direct appeal, the Court of Criminal Appeals found no objective evidence of a promise.[270]   Davis, however, claims that Detective Smith wrote a letter in 2004 that calls into question whether the State had indeed made him a promise.   By 2004, McDonald was incarcerated for the attempted murder of Steve Sherman, a crime she and Davis had committed days after the Foster murder. Detective Smith's protest letter mentioned that "[a]fter months of

---

[268]Opinion, <u>Davis v. State,</u> No. AP 71,513, Docket Entry No. 32-29 at 14-15.

[269]Supplemental Transcript, Findings of Fact and Conclusions of Law Concerning the Voluntariness and Admissibility of the Defendant's Videotaped Oral Confession, Docket Entry No. 32-3 at 3-6.

[270]Opinion, <u>Davis v. State,</u> No. AP 71,513, Docket Entry No. 32-29 at 14-15.

investigation Davis agreed to confess to the crime in exchange for McDonald not facing prosecution in this case."[271]   According to Davis, the State should have turned over the protest letter before his 2011 penalty-only retrial.  Davis also claims that the protest letter proves that the State presented false evidence at both trials which "went directly to multiple critical issues—the veracity and reliability of Davis's confession and the credibility of the State's most important witness . . . ."[272]

Davis raised these three claims in his eighth state habeas application, which he filed in 2015.[273]  The State filed a motion to dismiss which relied on three affidavits to counter Davis's claim that the State had promised him immunity.[274]  The State submitted an affidavit in which Detective Smith reiterated Davis received no

---

[271]Exhibits, Letter dated January 6, 2004, Docket Entry No. 40-2 at 74).

[272]Petition, Docket Entry No. 30 at 304. Whether or not Davis received a promise of leniency for his wife was only a minor theme through his penalty retrial. The defense wanted to reexamine whether Davis confessed because he "want[ed] to get immunity for his wife." Reporter's Record-Vol. 17, Punishment Proceedings, Docket Entry No. 33-24 at 17-18; Docket Entry No. 33-25 at 48-50. The trial court allowed the defense to question witnesses about the alleged immunity agreement. Id. at 54. Detective Smith testified in the retrial and said that there had been discussions about immunity, but nothing had been promised to Davis. Id. at 85-87.

[273]Supplemental Writ of Habeas Corpus, Subsequent 11.071 Application for Writ of Habeas Corpus, Docket Entry No. 34-72 at 4-43.

[274]State's Motion to Dismiss Applicant's Subsequent Application for Writ of Habeas Corpus, Docket Entry No. 34-73 at 1-45.

promise in exchange for his confession.[275]   Officer Smith explained

that his statement in the protest letter was "true" but "it is

incomplete so it gives the wrong impression."[276]   Detective Smith

continued:

> As I said before, Davis did say at first that he would
> confess in the capital murder case in exchange for
> McDonald not being prosecuted in that case, but he wasn't
> able to make that deal because no one would give him that
> promise or any promise. . . .  I should have said that
> "*Davis first agreed to confess to the crime in exchange
> for McDonald not facing prosecution, but no one would
> make him that promise and he ended up confessing without
> any promise being made to him.*[277]

The State supported this statement with affidavits from two

other police officers denying that any promise had been made.

The question of whether Davis confessed only pursuant to a

promise was a constant theme throughout Davis's two trial

proceedings and his post-trial judicial review.   The record

consistently shows that the State did not make any promise to

Davis.   During his suppression hearing testimony, Davis admitted

that he said in his confession that he had not been promised

anything.[278]   All courts that have considered the question have

found that Davis did not receive any promise of immunity for

_____

[275]Id. at 41.

[276]Id.

[277]Id. at 41-42 (emphasis added).

[278]Postconviction Writ, Statement of Facts-Vol. 5 [1992], Pretrial
Motions, Docket Entry No. 32-7 at 26, 28.

-118-

McDonald.[279]   Davis's own testimony showed that any belief in a promise was a subjective one.

Davis grasps at a slender reed to argue that the State had indeed made a promise.  Davis claims that the protest letter proves the State made him promises that resulted in his police statement. Despite Detective Smith's clumsy word choice in one inartful letter, the record extensively demonstrates that no promises were made.  Taking into account the whole record, Davis has not shown that the trial testimony "was actually false."  Fuller v. Johnson, 114 F.3d 491, 496 (5th Cir. 1997).

Davis also cannot show that the protest letter would have made a difference.  While both false-evidence and Brady claims have a prejudice component, different standards of materiality apply to each.  See Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993).  Even under the "less demanding" false-evidence standard, Davis has not shown "any reasonable likelihood" that the protest letter "could have affected the judgment of the jury."  United States v. Agurs, 96 S. Ct. 2392, 2398 (1976) (citing Giglio v. United States, 92 S. Ct. 763, 766 (1972)).  The court would deny claims thirteen, fourteen, and fifteen if the merits were fully available for federal review.

---

[279]Clerk's Record, Findings of Fact and Conclusions of Law Concerning the Voluntariness and Admissibility of the Defendant's Videotaped Oral Confession, Docket Entry No. 32-3 at 6.

**L.   Low Intelligence (claim 16)**

In his sixteenth claim for relief, Davis argues that, even if he does not qualify for <u>Atkins</u> protection, his low intelligence should exclude him from execution.   In essence, Davis asks for an extension of <u>Atkins</u> to include a category of people who the psychological community does not consider intellectually disabled, but nonetheless who still have low intelligence.   Davis also makes the cursory and unsupported argument that his appellate counsel provided deficient representation by not raising a similar claim on direct appeal.

The state habeas court found this claim "meritless" when Davis raised it in his seventh state habeas application.[280]   Davis makes no effort to meet his AEDPA requirement of showing that the state decision was contrary to, or an unreasonable application of, federal law.   Nor could he. Federal courts have constantly refused to extend <u>Atkins</u> into other areas of mental health concern.[281] Because a federal habeas court cannot create new constitutional

---

[280]Postconviction Writ, Findings of Fact and Conclusions of Law and Order, Docket Entry No. 34-57 at 245, 256.

[281]<u>See Green v. Lumpkin</u>, 860 F. App'x 930, 941 5th Cir. 2021) (mental illness); <u>In re Soliz</u>, 938 F.3d 200, 203 (5th Cir. 2019) (fetal alcohol syndrome); <u>Smith v. Davis</u>, 927 F.3d 313, 339 (5th Cir. 2019) (schizophrenia); <u>Rockwell v. Davis</u>, 853 F.3d 758, 763 (5th Cir. 2017) (mental illness); <u>Shore v. Davis</u>, 845 F.3d 627, 633 (5th Cir. 2017) (brain injury); <u>Mays v. Stephens</u>, 757 F.3d 211, 219 (5th Cir. 2014) (mental illness); <u>Ripkowski v. Thaler</u>, 438 F. App'x 296, 303 (5th Cir. 2011) (serious mental impairment).

-120-

law, <u>see Teague v. Lane,</u> 109 S. Ct. 1060 (1989), <u>abrogated in part by</u> <u>Edwards v. Vannoy,</u> 114 S. Ct. 1547, 1562 (2021), this court cannot extend the categorical exemption from <u>Atkins</u> to individuals with low intelligence.  This claim is meritless.

## M.    Penalty Only Re-Trial (claim 17)

Davis's seventeenth claim argues that the Due Process Clause prohibits a retrial, such as he had, only on the question of punishment.[282]  When Davis raised this claim in his seventh state habeas application, the state court found that he had defaulted consideration of the merits by not making a contemporaneous trial objection.[283]  The state court alternatively denied the merits.[284] Davis makes no effort to overcome the procedural bar or show he merits relief under AEDPA.  Further, no constitutional law requires a new guilt/innocence trial when a court orders a new sentencing hearing.  The court would deny this claim if the merits were available for federal consideration.

## N.    Commonly Raised Claims (claims 19 and 20)

Davis raises two meritless claims which federal courts have

---

[282]Petition, Docket Entry No. 30 at 333.

[283]Postconviction Writ, Findings of Fact and Conclusions of Law and Order, Docket Entry No. 34-57 at 256.

[284]<u>See</u> <u>id.</u>

repeatedly rejected.  In claim nineteen, Davis argues that the wording of the penalty-phase instructions restricted what evidence the jury could consider as mitigating.  In claim twenty, Davis raises a challenge to Texas' prohibition on informing jurors that one vote would result in a life sentence (commonly called the "10/12 Rule").  Courts have regularly and consistently rejected similar arguments.  Davis has not provided "a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2); see also Williams v. Lumpkin, 2021 WL 4502419, at *3 (N.D. Tex. 2021) (discussing the possibility of sanctions for failing to comply with Rule 11(b)(2) when raising similar claims).  The court cautions counsel against raising frivolous arguments which run counter to prevailing authority without showing a good-faith basis for extending the law.

## O.   Administration of the Death Penalty (claim 21)

Davis argues that both the State of Texas and Harris County have engaged in a systemic pattern of discrimination based on geography and race in capital sentencing.  Davis defaulted this claim in state court and makes no effort to overcome the resultant procedural bar.  Alternatively, federal courts have repeatedly rejected similar constitutional challenges.[285] Nothing in this case

---

[285]See Allen v. Stephens, 805 F.3d 617, 631 (5th Cir. 2015)
(continued...)

suggests a different result. Davis's crime easily fits the statutory requirements for capital murder. Nothing suggests that the prosecutor in this case considered anything other than the severity of the crime in deciding the severity of the punishment to seek. In addition to the procedural bar that forecloses full review, the court alternatively finds that Davis's twenty-first claim lacks merit.

**P.   Trial Court Error (claims 22 and 23)**

Davis raises two claims alleging error in his 2011 retrial. In the first, Davis argues that the trial court improperly excluded a witness's testimony on hearsay grounds (claim 22).[286]  In the other, Davis contends that the trial court should have granted a mistrial when one witness mentioned his prior death sentence (claim 23).[287]  Davis makes no effort to show that the Court of Criminal Appeals erred when rejecting these claims in his second direct appeal.

------------------------------------

(...continued)
abrogated on other grounds by Ayestas v. Davis, 138 S. Ct. 1080 (2018); Broadnax v. Lumpkin, 987 F.3d 400, 414 (5th Cir. 2021); White v. Thaler, 522 F. App'x 226, 235 (5th Cir. 2013); Wells v. Lumpkin, 2023 WL 7224191, at *14 (N.D. Tex. 2023); Johnson v. Lumpkin, 593 F. Supp.3d 468, 509 (N.D. Tex. 2022); Cole v. Lumpkin, 2021 WL 4067212, at *33 (S.D. Tex. 2021); Batiste v. Davis, 2017 WL 4155461, at *30 (S.D. Tex. 2017); Rockwell v. Davis, 2016 WL 4398378, at *25 (N.D. Tex. 2016).

[286]Petition, Docket Entry No. 30 at 358-65.

[287]Id. at 366-71.

Davis's pleadings and argument in state court focused on the operation of state law.  In each instance, Davis only briefly mentioned any federal but extensively discussed the operation of state law.  Whether or not a state court has correctly applied Texas law is not a matter for federal habeas concern.  See Cupit v. Whitley, 28 F.3d 532, 536 (5th Cir. 1994); Smith v. Whitley, 1994 WL 83777, at *1 (5th Cir. 1994).  Federal habeas corpus relief is only available if any error was "so extreme that it constitutes a denial of fundamental fairness under the Due Process Clause." Bridge v. Lynaugh, 838 F.2d 770, 772 (5th Cir. 1988); see also Jackson v. Johnson, 194 F.3d 641, 656 (5th Cir. 1999) ("In habeas actions, we do not .sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding.").  Davis must show a violation of constitutional law.

In claim twenty-two, Davis faults the trial court for excluding one witness's testimony as hearsay.  Davis asks this court to decide whether the trial court correctly applied state law when excluding the witness's testimony.  The Court of Criminal Appeals found that the challenged statements were not "against his penal interest" and did not meet any Texas exception to the hearsay doctrine.  Davis, 2013 WL 5773353, at *2.  The court has reviewed the comments and the Court of Criminal Appeals' resolution of the

-124-

issue.  Davis has not shown that the exclusion of the statements was fundamentally unfair.

Davis's twenty-third claim alleges that the trial court erred by not ordering a mistrial when one witness mentioned that Davis "had been on death row."[288]  Davis again argues on federal review that the denial of a mistrial was in error. Here, the trial court instructed jurors to ignore the witness's mention of death row. Courts presume that juries will follow their instructions.  See Zafiro v. United States, 113 S. Ct. 933, 939 1993); Richardson v. Marsh, 107 S. Ct. 1702, 1709 (1987).  Courts only "abandon[] that presumption only when there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating." United States v. Patino-Prado, 533 F.3d 304, 313 (5th Cir. 2008) (quotation omitted).  The Court of Criminal Appeals reasonably found that no evidence suggested that the jury could not follow its instruction.

Davis has not shown that he merits federal habeas corpus relief on claims 22 and 23.


Q.   **Jury Questions (claims 25, 26, 27, 28)**

Davis raises four claims based on the trial court's efforts to limit the jury's exposure to information about Davis's prior death

---

[288]Reporter's Record-Vol. 23 [2011], Docket Entry No. 33-30 at 253-54.

sentence.  Davis has not adequately briefed these claims for the purposes of federal habeas review.  Davis raised these claims in his second direct appeal.  Davis's federal petition copies the briefing from that action, nearly word-for-word, into his federal petition.[289]  Davis, in fact, left intact all references to himself as "appellant" and preserved his citations to state law.  Aside from adding a single citation to federal law at the end of his lengthy state-court argument, Davis makes no effort to frame his claims in the context of the federal constitution, provide relevant legal argument based on federal law, recognize the state court's decision on the merits, and then show that the state court's rejection of his claims requires relief under AEDPA.

Respondent has answered by placing the claims into the context of federal constitutional law and then reviewing them through the prism of AEDPA's deferential standards.[290]  Davis's Reply, in turn, does not even mention these claims.  An inmate represented by counsel who invokes federal jurisdiction, thereby compelling action by the State and the judiciary, essentially abandons any argument that he is entitled to relief when he ignores the AEDPA standard.  With Davis's lack of effort, it would waste judicial resources to

---

[289]Compare Petition, Docket Entry No. 30 at 371-83 and Brief for Appellant, Docket Entry No. 33-46 at 71-90.

[290]Answer, Docket Entry No. 88 at 387-98.

discuss these claims at any length.   The court has reviewed the pleadings, the record, and the law.   The court summary finds that Davis is not entitled to relief under AEDPA or the federal constitution on claims 25, 26, 27, and 28.

## VI. __Certificate of Appealability__

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner.   A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that 'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" __Tennard v. Dretke,__ 124 S. Ct. 2562, 2565 (2004) (quoting __Slack v. McDaniel,__ 120 S. Ct. 1595, 1604 (2000)).   Under the controlling standard this requires a petitioner to show that "jurists of reason could disagree with the [reviewing] court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." __Buck v. Davis,__ 137 S. Ct. 759, 773 (2017) (citation and internal quotation marks omitted).

After a careful review of the pleadings and the applicable

law, the court concludes that reasonable jurists would not find the assessment of the constitutional claims debatable or wrong. Because Davis does not demonstrate that his claims could be resolved in a different manner, a certificate of appealability will not issue in this case.[291]

## VI. Conclusion and Order

The court **ORDERS** as follows:

1.   The Death Penalty Case Application for Post-Conviction Writ Of Habeas Corpus filed by Brian Edward Davis (Docket Entry No. 30) is **DENIED,** and this action will be **DISMISSED WITH PREJUDICE.**

2.   A certificate of appealability is **DENIED.**

The Clerk shall provide a copy of this Memorandum Opinion and

---

[291]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with this federal habeas action. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. Davis's selective discussion of the state court proceedings and failure to address the AEDPA standard have increased the amount of time required to adjudicate his federal petition. Despite Davis's failure to cure procedural defects in many of his claims, the court has spent substantial time considering their merits in the alternative. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

-128-

Order to the parties.

      **SIGNED** at Houston, Texas, on this 4th day of September, 2024.

                                       SIM LAKE
                        UNITED STATES DISTRICT JUDGE